# SOUTHERN RAILWAY CO. ET AL. v. YOUNGBLOOD, ADMINISTRATRIX.

No. 788.   Submitted April 28, 1932.—Decided May 16, 1932.

*Messrs. H. O'B. Cooper, Sidney S. Alderman, Frank G. Tompkins,* and *S. R. Prince* submitted for petitioners.

*Mr. William C. Wolfe* submitted for respondent.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

Respondent brought this action under the Federal Employers' Liability Act to recover for the death of her intestate, a conductor in petitioners' employ, who was killed in a head-on collision while riding on the engine of an

extra train. Petitioners operate a single track railroad between Charleston and Columbia, South Carolina, through Branchville, Orangeburg, St. Matthews, and Fort Motte. Trains running from Columbia to Charleston are designated eastbound, and those from Charleston to Columbia westbound. On the morning of the accident the engine of a westbound freight train became disabled at Fort Motte, a station nineteen miles west of Orangeburg. A yard engine kept at Branchville, eighteen miles east of Orangeburg, was ordered to go to its relief. This locomotive, running light, was designated as Extra 483 West, and had a crew consisting of respondent's intestate as conductor, an engineer, and a fireman. A freight train known as Extra 723 East was moving eastwardly from Columbia to Charleston, and it was necessary for the two to meet and pass somewhere on the line. The train dispatcher at Charleston sent a telegraphic order to Branchville, the place of departure of Extra 483, and to Orangeburg, the selected passing point, as follows:

" Extra 723 East get this order and meet Extra 483 West at Orangeburg. Engine 483 run extra Branchville to Andrews."

Such an order is known as a form 31, which has to be signed for by the conductor when delivered to him. The order was transmitted and received by the operators at Branchville and Orangeburg as a " three copy " order and the operator at Branchville accordingly made three copies, one for his file and two which he delivered to respondent's intestate, who signed for the same and delivered one to the engineer. They read it in the presence of the fireman before leaving Branchville. There was nothing on the face of the order to indicate that No. 483 would be given additional copies of it, or would receive any other order, at Orangeburg, the designated passing point. The Charleston dispatcher intended that this order as transmitted to Orangeburg, and addressed at that point to " Extra 723

East and operator," should be what is known as a " five-copy " order—that is, that the operator at Orangeburg should make five copies, one for his file and two to be delivered to the conductor of each of the trains which were to pass at that point. Through some oversight the Orangeburg operator received the message as a three-copy order, one of which would be retained for his file and the other two given to the conductor of Extra 723 East. Thus there were no copies for delivery, as intended, to respondent's intestate, the conductor of Extra 483 West, as there would have been had the order been received and understood at Orangeburg as a five-copy one.

Under the rules of the company the eastbound train, 723, was the superior, and it was the duty of 483 to take the siding at Orangeburg and permit the other to pass on the main track. At that point the semaphore signal was located in front of the operator's office about seventy-five yards east of the east switch of the pass track, so that the westbound 483 approaching Orangeburg would necessarily have to pass this semaphore to reach the entrance of the pass track, which is about three-fourths of a mile long. As 483 was approaching the semaphore the Charleston dispatcher called the Orangeburg operator and inquired as to its whereabouts. The operator replied that it was then approaching. The dispatcher told the operator to " tell him to go to the west end of the pass track and wait on Extra 723." Engine 483 stopped just east of the semaphore and blew four blasts, a signal inquiring whether the operator has any orders for the train. In response the latter dropped the semaphore, which is an indication to the crew that there are no further orders and that they are to proceed under those they then have. The intended verbal instructions were not given. After leaving Branchville the crew of No. 483, having received no further or other orders with respect to passing Extra 723, were under a duty to follow the written orders received at Branch-

ville, which involved passing the semaphore at Orangeburg and going on the pass track to clear the main line for No. 723. Instead the train went up the main line, failing to enter the pass track at either the east or the west switch. As it approached the west switch a yard locomotive blew a warning blast and the engine stopped momentarily. The fireman then inquired of the conductor and engineer whether they were not going to go in on the pass track, to which the conductor replied that they had time to reach the switch at Stilton, some two miles beyond. They proceeded on the main track beyond Stilton, evidently missing the switch there because of a heavy fog. The engine collided head-on with Extra 723, killing respondent's intestate and the engineer, and three of the crew of 723.

There was no allegation of negligence on the part of the engineer of 483 or any member of the crew of Extra 723, the sole claims being with respect to the failure of the operator at Orangeburg to make a five-copy passing order and deliver two copies of it to the respondent's intestate, and the failure of the same operator to give the verbal instructions to respondent's intestate to run to the west end of the pass track and wait for 723. A request by petitioners for a binding instruction, on the ground that there was no evidence of negligence on the part of petitioners or their employee which in whole or in part caused the accident, was refused. The trial court submitted the case to the jury and a resulting verdict and judgment in favor of respondent was affirmed by the state supreme court.

Beyond peradventure respondent's intestate disobeyed a definite order which was not revoked or superseded by any other orders, verbal or written. By force of this order and the rules of the company No. 483 was bound to pass the semaphore at Orangeburg, run onto the pass

track, and not leave until 723 had passed on the main track. Copies were found on the persons of both the conductor and engineer after the collision. This crass disobedience of operating orders was the sole cause of the intestate's death. If the order respecting the passing of the trains had been made as a five-copy order the operator at Orangeburg would merely have handed the crew two copies in the same words as those of the order they then held, which then governed their conduct. If the operator at Orangeburg had verbally confirmed the order that 483 was to run to the west end of the pass track and wait there for 723 this verbal instruction would not in any wise have altered the duty of respondent's intestate under his existing written orders.

The suggestion is made that the dispatcher was negligent in not communicating the passing order to the crew of Extra 723 at some point west of Orangeburg, so that they would have known they were to pass Extra 483 at Orangeburg. But such a procedure would not have altered the running of Extra 723 in any particular. It would still have had the right of way over 483 to and through Orangeburg, and the accident occurred over three miles west of that point.

The case comes to this: that respondent's intestate had clear and definite orders which if obeyed would have avoided the accident and the disobedience whereof was the sole efficient cause of his death. As said in *Unadilla Valley Ry. Co.* v. *Caldine,* 278 U. S. 139, 142:

"A failure to stop a man from doing what he knows that he ought not to do, hardly can be called a cause of his act. Caldine had a plain duty and he knew it. The message would only have given him another motive for obeying the rule that he was bound to obey."

The record is destitute of any evidence of negligence on the part of the petitioners or their servants or agents

which was in any degree a cause of the death of respondent's intestate, and there was nothing to submit to the jury.

The judgment must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*