## SOUTHERN RY. CO. v. WOODS.

Western Section. March 9, 1935.

Petition for Certiorari denied by Supreme Court, July 13, 1935.

Cates, Smith & Long, of Knoxville, for plaintiff in error.
Kennerly & Key, of Knoxville, for defendant in error.

KETCHUM, J. This suit was brought by Mrs. Mary A. Woods, administratrix of the estate of her husband, A. M. Woods, deceased, for damages for personal injuries sustained in a railroad collision which resulted in his death some ten days later. The suit was brought and prosecuted under the Federal Employers' Liability Act (45 U. S. C. A., sec. 51, et seq.) and Safety Appliance Acts (45 U. S. C. A., sec. 1, et seq.). On the trial there was a verdict and judgment in favor of the plaintiff in error for $9,000, from which the railway company prosecuted this appeal in error to this court.

Mr. Woods, the plaintiff's intestate, had been in the service of the defendant as a locomotive engineer for some twenty-five years before his death. Early in the morning on March 1, 1932, he was called to take a wrecking train from Knoxville to a point near Harriman where a freight train had been wrecked. The wrecking crew cleared up the wreck during the morning and the train was then operated to Harriman, where the engine was turned on a wye so as to head it back towards Knoxville. In this wreck there were three loaded box cars, two of which were being transported in interstate traffic. These cars were derailed, and the air line pipes and other brake appliances were disabled or broken so that the air brakes could not be operated. These three cars were put into the wrecking train to be taken to the defendant's shops at Knoxville for repairs. In assembling the train for the return trip, these disabled cars were put just ahead of the caboose which was at the rear end of the train. The caboose was equipped with air brakes, but its brakes were not connected with the engine because of the three disabled cars ahead of it. So the conductor or other employees riding in the caboose could not apply the air brakes either to the caboose or to the other parts of the train, nor could the engineer on the locomotive apply the air brakes to the three disabled cars or to the caboose.

When the train as thus made up reached Clinton on the return trip, the conductor and engineer received from the station agent three train orders reading as follows:

"Train Order No. 125.

"To Eng. 1252. At Clinton, Tenn.

"Eng. 1252 Run Extra Clinton to Coster Block with right over second and third class trains take siding meet No. 153 one fifty three Eng. 2509 at Heiskell."

"Train Order No. 126.

"To Ex. 1252 East 2/3/C at Clinton.

"Order No. 123 is annulled Eng. 4631 run Extra Heiskell to passenger station Clinton with right over second and third class trains meet extra 1252 east at east siding Clinton."

"Train Order No. 128.

"To Ex. 1252 East meet No. 153 one fifty three Eng. 2509 at Peak instead of Heiskell."

The wrecking train was known by the number of its engine as No. 1252 extra. The westbound train No. 153 was pulled by engine No. 2509. Peak is the first station east of Clinton, and Heiskell is the second. It will be seen that by train order No. 125 the engineer on No. 1252 Extra (Woods) was directed to meet No. 153 at Heiskell, but by train order No. 128, which was handed to him at the same time, he was directed to meet No. 153 at Peak instead of Heiskell.

As the wrecker left Clinton it passed engine No. 4631, on the east end of the siding as directed by train order No. 126, and under order No. 128 it was due to pass the westbound freight known as No. 153, engine No. 2509, at the next station, Peak. No. 153 was to take the siding at Peak and the wrecker was to pass it on the main track. When the wrecker reached Peak, No. 153 was not on the siding, and it was the duty of Engineer Woods to stop his train at the clearance post near the east end of the siding and wait for it; but either because he forgot order No. 128, or confused it with order No. 125 which directed him to pass No. 153 at Heiskell, he failed to stop at Peak.

The conductor and rear brakeman were riding in the cupola of the caboose at the rear end of the train. As the train was passing the station at Peak, the conductor observed that No. 153 was not on the siding, and that the brakes had not been applied to the wreck train, and realizing that Woods was not going to stop at Peak, and being unable to apply the brakes from the caboose, he went through the door of the caboose and climbed to the top of the freight car ahead and passed over the three disabled freight cars, then climbed down and went into the tool car which was just ahead, and was in the act of pulling the angle cock at the middle of the tool car, so as to apply the air brakes in emergency, when the collision with the westbound freight occurred.

The power-braked cars are all equipped with an air lever known as the "angle cock," so that the air brakes may be applied in emergency by any employee from any part of the train so equipped.

The specific acts of negligence on the part of the defendant which were relied upon as proximately causing the collision and the resulting injuries to the plaintiff's intestate were:

(1) That the defendant did not have 85 per cent. of the cars in this train equipped with air brakes in condition for operation, there being ten cars in the train with only six of them equipped with air brakes connected up with the locomotive; and the caboose at the rear of the train, although equipped with air brakes, was not associated with the other cars of said train which were so equipped with air brake appliances; and (2) that the defendant was negligent in placing the caboose in the rear of the train behind the three disabled cars, whereas, if it had been placed ahead of them and its

air brakes connected with the locomotive, as the law requires, the conductor would have been able to apply the brakes and bring the train to an immediate stop.

The proof is that the wreck occurred on a sharp curve at a point 1,227 feet, or nearly one-fourth of a mile, east of the clearance post at the east end of the siding at Peak; that the wrecker passed this clearance post at a speed of about ten miles per hour; that from that point it ran upgrade and at the time of the collision its speed had been reduced to approximately six miles per hour; and that the westbound train was going downgrade at a speed of about fifteen miles per hour when the collision occurred.

It was stipulated that the earnings of deceased in the twelve months from March, 1931, to and including February, 1932, amounted to $2,643.82 or about $220 per month; and there was evidence that he was 54 years of age at the time of his death, and that he had an expectancy of life of 18.09 years. There was also evidence that he was in good health, that he was an affectionate husband, and that he spent all of his earnings in the support of his family, consisting of his wife and a son 24 years of age at the time of his death. There was no testimony as to the age or expectancy of Mrs. Mary A. Woods, his widow and beneficiary, but she was present at the trial and testified as a witness in the presence of the court and jury. The deceased lingered for ten days after the collision, during which time he suffered the most excruciating pain and agony.

At the conclusion of the evidence there was a motion for a directed verdict for the defendant which was by the court overruled, and the defendant excepted. The case was then submitted to the jury on an unexceptionable charge, and as already stated there was a verdict in favor of the plaintiff for $9,000. The defendant seasonably filed its motion for a new trial which was entered of record upon the minutes, and which was by the court overruled and defendant appealed in error to this court.

There are two assignments of error in this court. The first is based upon the action of the trial court in overruling the defendant's motion for a directed verdict in its favor for the following reasons:

(1) Because there was no evidence to sustain the verdict.

(2) Because the willful disobedience of the "meet order" by the plaintiff's intestate, and his act in passing the meeting point, was the sole and proximate cause of the collision which resulted in his injuries and death.

(3) Because the handling of the three disabled cars in front of the caboose, and the failure to have 85 per cent. of the cars in said train associated together and equipped with power brakes operated by the engineer, was not the proximate cause of, and did not proximately contribute to, the accident and resulting injuries, but merely

created an incidental condition or situation in which the collision, otherwise caused, resulted in fatal injuries to plaintiff's intestate.

(4) Because the Federal Safety Appliance Acts and the orders of the Interstate Commerce Commission issued pursuant thereto do not require that the power brakes be operated from the caboose or any other car in the train; and the placing of the three disabled cars ahead of the caboose in this train, and thus making it impossible for the conductor or other employee in the caboose to apply the power brakes, was not a violation of the Safety Appliance Acts or of any order of the Interstate Commerce Commission issued pursuant thereto.

(5) Because there is no conflict in the evidence and the court should have declared as a matter of law that the willful act of the plaintiff's intestate in disobeying his "meet order" and running past the meeting point was the sole and proximate cause of his injuries and death.

(6) Because there was no evidence to show what proportion of his earnings plaintiff's intestate contributed to the support of his wife; nor was there any proof as to his age, or as to her age, or her expectancy of life.

The second assignment of error is that the verdict was so excessive as to show prejudice, passion, corruption, or caprice on the part of the jury.

There is no controversy as to the facts, so the first subsection of the first assignment, namely, that there is no evidence to support the verdict, will be considered in connection with the other subsections of said assignment.

The second and fifth subsections are based upon the ground that the willful disobedience by the plaintiff's intestate of the "meet order," and his running past the meeting point, was the sole and proximate cause of his injury and death. We find no evidence to warrant the conclusion that Engineer Woods willfully disobeyed the order to pass the westbound freight at Peak. The most that can be said is that he forgot it, as did also the front brakeman and the fireman who were on the engine with him, and both of whom heard the orders read. Or possibly he got the order confused with order No. 125 which directed him to pass No. 153 at Heiskell.

In Spokane & I. E. R. Co. v. Campbell, 241 U. S., 497, 508, 36 S. Ct., 683, 689, 60 L. Ed., 1125, 1135, it was argued that because Campbell had disregarded a "meet order" he had stepped aside from his line of duty so that the relationship of employer and employee was suspended. The court in the opinion by Mr. Justice Pitney say on this question:

"From the fact that he disregarded and in effect violated the order as actually communicated to him, it, of course, does not necessarily follow that he did this wilfully. The jury was not bound

to presume,—it would hardly be reasonable to presume—that he deliberately and intentionally ran his train out upon a single track on which he knew an incoming train with superior rights was then due. However plain his mistake, the jury reasonably might find it to be no more than a mistake attributable to mental aberration, or inattention, or failure for some other reason to apprehend or comprehend the order communicated to him. In its legal effect this was nothing more than negligence on his part, and not a departure from the course of his employment.''

What is here said is peculiarly applicable to the present case. Engineer Woods had been on constant duty for fourteen hours and was naturally fatigued; and we think it would be highly improper to hold as a matter of law that his disregard of his passing order on this occasion, disastrous as it was in its consequences, should be characterized as a willful disobedience of his orders. As we see it, there is no evidence to warrant such a conclusion.

In the case of City of Knoxville v. Cox, 103 Tenn., 368, 53 S. W., 734, it was held that momentary forgetfulness of a known danger is not as a matter of law such negligence as will bar a recovery, even at common law. The holding of the court is accurately stated in the syllabus as follows:

''Momentary forgetfulness of a known danger, that caused plaintiff's injury does not per se constitute such contributory negligence as will defeat his action. It is a fact to be considered by the jury along with the other facts of the case bearing upon the question of contributory negligence.''

The third and fourth subsections of said assignment relate to the alleged violation of the Federal Safety Appliance and Employers' Liability Acts. Without quoting the provisions of the acts at length, we think it will be helpful to set out the substance of those parts which pertain to the questions here involved.

Section 1 of the Federal Safety Appliance Act of 1893 (45 U. S. C. A., sec. 1, p. 4) provides that it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power-driving wheel brake and appliances for operating the train brake system, or to run any train in such traffic that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose. By section 6 of said act (45 U. S. C. A., sec. 6, p. 36) a penalty of $100 was imposed upon any such common carrier which hauled, or permitted to be hauled, or used on its line any car in violation of any provision of said act. And by section 8 (45 U. S. C. A., sec. 7, p. 46) it was provided that any employee of any such common carrier who might

be injured by any locomotive, car, or train in use contrary to the provision of said act should not be deemed to have assumed the risk thereby occasioned, although continuing in the employment of such carrier after the unlawful use of such locomotive, car, or train had been brought to his knowledge.

By section 1 of the amendatory act of 1903 (45 U. S. C. A., sec. 8, p. 46) it was provided that the provisions and requirements of said act relating to train brakes, etc., should be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce; and by section 2 thereof (45 U. S. C. A., sec. 9, p. 56) it was provided that not less than 50 per cent. of the cars in such train should have their brakes used and operated by the engineer of the locomotive drawing such train; and that all power-braked cars in such train which are associated together with said 50 per cent. should have their brakes so used and operated; and the more fully to carry into effect the objects of said act, the Interstate Commerce Commission was empowered to increase the minimum percentage of cars in any train required to be operated with power or train brakes; and pursuant to this power the Interstate Commerce Commission, by order of June 6, 1910, increased the percentage of cars in any train to be so equipped with power brakes from 50 per cent to 85 per cent.

And by section 13 (45 U. S. C. A., p. 65) it was provided that where any car had been properly equipped with safety appliances, and such equipment had become defective or insecure while in service, such car might be hauled to the nearest available point where it could be repaired, without liability for the penalty of the act, but that "such movement or hauling of such car shall be at the sole risk of the carrier, and nothing in this section shall be construed to relieve such carrier from liability in any remedial action for the death or injury of any railroad employee caused to such employee by reason of or in connection with the movement or hauling of such car with equipment which is defective or insecure or which is not maintained in accordance with the requirements of this Act [chapter]."

The Federal Employers' Liability Act (45 U. S. C. A., secs. 51 and 59, pp. 92 and 538) provides for two distinct rights of action for injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carriers, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, etc.; one of said rights of action inuring to the benefit of the injured employee, and the other to the benefit of his administrator for the benefit of his surviving widow or other designated beneficiaries in the event of his death (45 U. S. C. A., sec. 51, p. 92); and by an amendatory act (45 U. S. C. A., sec. 59, p. 538), it is provided that the right of action given to the

injured employee in the original act shall survive to his administrator, in the event of his death, for the benefit of the surviving widow or other relatives for whose benefit the other right of action is given.

By the third section of the Federal Employers' Liability Act (45 U. S. C. A., sec. 53, p. 379) it is provided that the contributory negligence of the employee shall not bar a recovery in any action brought by him for his injuries, or by his administrator for his death, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee; "provided, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.''

█ The two acts are to be construed together, both having been enacted to promote the safety of employees of railroads engaged in interstate commerce. In San Antonio & Aransas Pass Ry. Co. v. Wagner, 241 U. S., 476, 484, 36 S. Ct., 626, 630, 60 L. Ed., 1110, 1117, the court say: "But the two statutes are in pari materia, and where the employers' liability act [45 U. S. C. A., sec. 51] refers to 'any defect or insufficiency, *due to its negligence,* in its cars, engines, appliances,' etc., it clearly is the legislative intent to treat a violation of the safety appliance act [45 U. S. C. A., sec. 1, et seq.] as 'negligence,'—what is sometimes called negligence per se.''

The case of Spokane & I. E. Ry. Co. v. Campbell, 241 U. S., 497, 36 S. Ct., 683, 689, 60 L. Ed., 1125, is quite similar in all material respects to the case at bar. Campbell was a motorman in charge of a train made up of a motorcar and two trailers, all of which were equipped with air brakes; the trains were operated between Spokane, Wash., and Cœur d'Alene, Idaho, under standard railroad rules, with which Campbell was familiar. He was at Cœur d'Alene at about 4:30 p. m. ready to start for Spokane. No. 20 was about due and it was his duty to know that it had arrived before he started; but without waiting for No. 20, and through a misunderstanding of a verbal order from the conductor, he started on the return trip, and proceeded a short distance when he saw a train which proved to be No. 20 approaching on the same track from the opposite direction. He at once applied the brakes without success, and there was a collision in which he was seriously injured. The proof showed that he applied the brakes and that they caught for a moment and then "leaked off" so that he was powerless to stop the train. He based his right of action upon the ground that the company had not furnished him with a motor and train supplied with proper air brakes in working condition, as required by the Federal Safety Appliance Act. The jury returned a general ver-

dict in his favor for $7,500, and, in answer to special issues also submitted, found (1) that he had violated his orders in leaving before the arrival of No. 20, and (2) that the air brakes were insufficient to enable him to control the train. The Supreme Court of the United States, in upholding this verdict, say:

"Upon the whole case, we have no difficulty in sustaining his right of action under the employers' liability act. That act [45 U. S. C. A., sec. 51] imposes a liability for injury to an employee 'resulting *in whole or in part* from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, . . . or other equipment.' As was held in San Antonio & A. Pass Ry. Co. v. Wagner, 241 U. S. 476, 36 S. Ct. 626, 60 L. Ed. 1110, a violation of the safety appliance act [45 U. S. C. A., sec. 1, et seq.] is 'negligence' within the meaning of the liability act. And by the proviso to section 3 of the latter act [45 U. S. C. A., sec. 53], no employee injured or killed shall be held to have been guilty of contributory negligence in any case where a violation of the safety appliance act 'contributed to the injury or death of such employee.' It is too plain for argument that under this legislation the violation of the safety appliance act need not be the sole efficient cause, in order that an action may lie. . . . But where, as in this case, plaintiff's contributory negligence and defendant's violation of a provision of the safety appliance act, are concurring proximate causes, it is plain that the employers' liability act requires the former to be disregarded."

In Texas & Pacific Ry. Co. v. Rigsby, 241 U. S. 33, 36 S. Ct., 482, 484, 60 L. Ed., 874, Rigsby, who was a switchman, was engaged with others of the yard crew in taking some "bad order" cars to the shops of the defendant, at Marshall, Texas, for repairs. The cars were on a spur track in the defendant's yard, and in this switching operation, Rigsby was riding on top of one of these "bad order" cars for the purpose of setting the brakes. As he descended from the top of the car one of the hand-holds or grabirons that formed the rungs of the ladder pulled loose, and he fell to the ground and was injured. He sued for damages under the Safety Appliance Act. The court in an opinion by Mr. Justice Pitney held that the "plaintiff's injury was directly attributable to a defect in an appliance which, by the 1910 amendment [45 U. S. C. A., sec. 11]. was required to be secure, and the act must therefore be deemed to create a liability in his favor. . . . The question whether the defective condition of the ladder was due to defendant's negligence is immaterial, since the statute imposes an absolute and unqualified duty to maintain the appliance in secure condition." And the cases are numerous in which it is held that the duty imposed upon the carrier to equip its trains and cars with

the appliances required by the Safety Appliance Acts is an absolute and unqualified duty, and that the failure to comply with it is negligence. St. Louis, I. M. & Southern R. R. v. Taylor, 210 U. S., 281, 294, 295, 28 S. Ct., 616, 52 L. Ed., 1061, 1068; Chicago, B. & Q. R. Co. v. United States, 220 U. S., 559, 575, 31 S. Ct., 612, 55 L. Ed., 582, 588; Delk v. St. L. & S. F. R. Co., 220 U. S., 580, 586, 31 S. Ct., 617, 55 L. Ed., 590, 595.

■ ■ It follows from this that we must hold that the railway company, in so far as its liability to the plaintiff is concerned, was guilty of negligence as a matter of law in failing to have 85 per cent. of the cars in its train equipped with air brakes as required, and also in failing to have the caboose, which was so equipped, ahead of the three disabled cars, in said train. And by the terms of the act, if its negligence in this regard contributed proximately to the death of the plaintiff's intestate, then he is not to be held to have been guilty of contributory negligence in disregarding the passing order.

Counsel for the plaintiff in error earnestly rely upon the cases of Davis, Agent, v. Kennedy, 266 U. S., 147, 45 S. Ct., 33, 69 L. Ed., 212; Southern Railway Co. v. Youngblood, 286 U. S., 313, 52 S. Ct., 518, 76 L. Ed., 1124; Southern Railway Co. v. Dantzler, 286 U. S., 318, 52 S. Ct., 520, 76 L. Ed., 1127; St. Louis Southwestern Ry. Co. v. Simpson, 286 U. S., 346, 52 S. Ct., 520, 76 L. Ed., 1152, as sustaining his contention that the plaintiff here was not entitled to recover because the collision and the resulting death of her intestate was due solely to the latter's negligence in disobeying or disregarding the "meet order." Those cases, however, are distinguishable from the case at bar because they were all brought under the Federal Employers' Liability Act and the question of the defendants' negligence by reason of the violation of the Federal Safety Appliance Acts was absent in all of them. In those cases the railroad companies were not shown to have been guilty of any negligence whatever, while in the instant case the defendant was guilty of negligence as a matter of law, as above stated.

It is further urged as a ground for its motion for a directed verdict that Woods was quite able to handle and control the train with only six cars equipped with air brakes, and that he had in fact done so from Harriman to and past the town of Clinton, and therefore the handling of the three cars in front of the caboose and, the failure to have 85 per cent. of the cars in the train equipped with air brakes and associated together so the brakes could be applied by the engineer was not the proximate cause of, and did not proximately contribute to, the accident, but merely created an incidental condition or situation in which the collision, otherwise caused, resulted in the fatal injuries to the plaintiff's intestate.

We are unable to say "as a matter of law" that this was true.

When the head brakeman, Ellis, saw the opposing train coming, he at once shouted a warning to Engineer Woods and the latter immediately reached for the air brake lever. Ellis estimated that the other train was about twelve car lengths, or 480 feet, away. Ellis at once jumped from the engine, and as he jumped he felt the air brakes apply, and he did not think the trains would come together with enough force to hurt anybody. Undoubtedly a quicker stop could have been made if the train had had nine cars equipped with air brakes, as the law required, instead of six. Who can say that this collision might not have been averted if the law had been complied with in this respect?

Nor can we agree to the defendant's contention that it was entitled to a directed verdict because the Federal Safety Appliance Acts do not require that the power brakes be operated from the caboose or any other part of the train, and that therefore the placing of the three disabled cars ahead of the caboose, thus rendering it impossible for the conductor or other employee to apply the brakes, was not an act of negligence. The act did require that at least 85 per cent. or nine out of the ten cars in said train should be equipped with air brakes, and that they should all be connected together and with the engine so that the engineer might be able to apply the brakes to the entire 85 per cent. It is also shown that under the rules of the defendant the conductor and the engineer were jointly and equally liable for the operation of said train, and that the caboose was equipped with an angle cock so that the brakes could have been instantly applied and the train brought to an immediate stop if the law had been complied with. The evidence shows that as soon as the conductor saw that the engineer had passed the switch he made a supreme effort to stop the train, and if the caboose had been placed ahead of the disabled cars as the law required, this collision would, in all probability, have been averted.

After all, the real question for determination is whether or not the violation by the defendant of the Safety Appliance Act was the proximate cause of the collision. It is conceded that the plaintiff's intestate disregarded his train orders and that in this he was guilty of negligence. It is also shown that the defendant violated the provisions of the Safety Appliance Act both in failing to have 85 per cent. of the cars in the train equipped with air brakes, and in putting the caboose behind the three disabled cars so that its air brakes could not be connected up with the other cars which were so equipped and with the engine. This was negligence as a matter of law on the part of the defendant. In this situation, was the death of the plaintiff's intestate the result "in whole or in part" of this negligence of the defendant? If so. the plaintiff's intestate cannot be held to have been guilty of contributory negligence. To state the question differently, was the death of the plaintiff's in-

testate proximately caused by the concurrent negligence of the plaintiff's intestate in disregarding his "meet order," and of the defendant in violating the provisions of the Safety Appliance Act? We do not think it was error for the learned trial judge to submit this question to the jury. It is a question about which fair-minded men might honestly differ.

In Milwaukee, etc., R. R. v. Kellogg, 94 U. S., 469, 474, 24 L. Ed., 256, 259, it is said:

"The true rule is, that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it."

This is in accord with the rule as announced by our own Supreme Court in the cases of Fairbanks, Morse & Co. v. Gambill, 142 Tenn., 633, 642, 222 S. W., 5; Moody and Horn v. Gulf Refining Co., 142 Tenn., 280, 289, 218 S. W., 817, 8 A. L. R., 1243. See, also, 22 R. C. L., p. 148. It is true that where the facts are undisputed and are susceptible of but one inference, the question is one of law for the court. Id. We think reasonable minds might honestly reach different conclusions from the undisputed facts in this case.

█ It is next insisted that the motion for a directed verdict should have been granted because there was no evidence to indicate what proportion of his earnings the plaintiff's intestate customarily contributed to the support of his wife; nor was there any proof as to his age or the age and expectancy of his wife. While the proof is meager, there was some evidence with respect to these matters upon which the jury would have been warranted in basing a verdict. The motion was properly denied upon the further ground that proof with respect to these matters was not necessary in order to support a verdict upon the right of action for the conscious pain and suffering of the deceased during the ten days that he lingered.

Upon a careful consideration of the record, we are of opinion that there is no merit in the first assignment of error, and it is accordingly overruled.

█ This brings us to the consideration of the second assignment of error, which is based upon the alleged excessiveness of the verdict. There is no contention that it was a dishonest or corrupt verdict. The plaintiff had two distinct rights of action, one for the conscious pain and suffering of the deceased lasting over a period of ten days, and the other for the pecuniary loss sustained by the widow. The verdict of $9,000 was approved by the trial court and we do not think it is excessive. The assignment will be overruled upon the authority of Reeves v. Catignani, 157 Tenn., 173, 7 S. W. (2d), 38.

Both assignments having been overruled, it results that the judgment of the circuit court will be in all respects affirmed, at the cost of plaintiff in error and surety.

Senter and Anderson, JJ., concur.