NASHVILLE, C. & ST. L. RY. v. HINES.—94 S. W. (2d) 397.

Eastern Section. May 18, 1935.

Petition for Certiorari denied by Supreme Court, Oct. 13, 1935.

2

Brown & Spurlock, of Chattanooga, for plaintiff in error.
Thach & Thach, of Chattanooga, for defendant in error.

DeWITT, J.   On the night of November 19, 1931, William Walker, a car inspector employed by the Nashville, Chattanooga & St. Louis Railway, was fatally injured by its switching engine while standing close to track No. 2 in its Cravens Yards in Chattanooga.   His administrator recovered in this action a judgment for $5,000 upon the verdict of a jury under the Federal Employers' Liability Act, as

4

amended (45 U. S. C. A., secs. 51-59). It is conceded that the engine and the deceased were engaged in the interstate transportation of freight cars that had arrived over the Southern Railway and were about to be carried by the Nashville, Chattanooga & St. Louis Railway to Atlanta, and that the deceased was engaged in inspecting the cars.

A demurrer to the declaration was properly overruled, as it attacked the jurisdiction of the court to entertain the cause of action, as stated in the declaration, on the ground that in such action, even in the state court, the rule obtaining in the federal courts as to the character and quantum of evidence justifying a submission of the case to the jury must be applied. This rule of practice in the courts of the United States is that: "Whenever, in the trial of a civil case, it is clear that the state of the evidence is such as not to warrant a verdict for a party, and that if such a verdict were rendered the other party would be entitled to a new trial, it is the right and duty of the judge to direct the jury to find according to the views of the court." Barrett v. Virginian Railway Company, 250 U. S., 473, 474, 39 S. Ct., 540, 541, 63 L. Ed., 1092.

In Brenizer v. Nashville, C. & St. L. Railway, 156 Tenn., 479, 3 S. W. (2d), 1053, 8 S. W. (2d), 1099, it was declared that this rule was announced for the courts of the United States only, and no purpose had been declared to force it upon the state courts.

In Luck v. Louisville & N. R. R. Co., 167 Tenn., 350, 69 S. W. (2d), 899, 901, referring to a claim made that the rule stated in the Brenizer Case had been later disapproved by the United States Supreme Court in two cases (Western & A. R. R. v. Hughes, 278 U. S., 496, 49 S. Ct., 231, 73 L. Ed., 473, and Chesapeake & O. Ry. Co. v. Kuhn, 284 U. S., 44, 52 S. Ct., 45, 76 L. Ed., 157), it is said: "Neither of these cases went up from Tennessee, and the constitutional provisions, held in the Brenizer Case to be controlling in this jurisdiction, were not considered." We therefore treat the decision in the Brenizer Case as setting forth the procedural rule to be observed by this court.

It is here insisted that the motion of the railway for a directed verdict made at the close of all the evidence was erroneously overruled, it being claimed that the deceased had assumed the risk of the switching operations; that his contributory negligence in exposing himself voluntarily, unnecessarily, without looking, to the engine, instead of employing a manifestly safer method of performing his duties, was the proximate cause of his injuries; that, if the movement of the cars was an extraordinary movement, the danger was open, obvious, and fully known to him; that at the time of the accident he was standing within striking distance of the switch engine, in violation of the written rules of the defendant established for his protection, and in viola-

tion of the well-established practice and custom prevailing in switch yards that old employees were expected to look out for their own safety; and that no emergency existed which justified him in adopting an unsafe method of performing his duties. In this motion for a directed verdict it was also claimed that the aforesaid rule prevailing in the federal courts in the construction and enforcement of the Federal Employers' Liability Act should be observed and applied, and therefore that there was not sufficient evidence to require submission of the case to the jury because the preponderance of the evidence against the plaintiff administrator was so overwhelming that the court would be compelled to set aside the verdict if one were rendered in his behalf. It was therein further claimed that there was no proof of pecuniary damages having been sustained by the alleged dependents of the deceased by his injuries and death.

Under the rules stated in the Brenizer Case, as aforesaid, in no view was it error to overrule the motion based upon the preponderance of the evidence according to the rule of practice in the United States courts. We will, however, in applying the provisions of the Federal Employers' Liability Act, determine whether or not there was evidence of a substantial and material character upon which the jury would be warranted in predicating a verdict in favor of the plaintiff.

The following facts appear without dispute: That Mr. Walker, 62 years of age, had served in this employment as a car inspector for about 40 years, with some brief intermissions. Along the east side of the yard were some main line tracks and many switch tracks. He was struck when close to switch track No. 2 between it and switch track No. 1, both of which tracks extended from one of the lead tracks to points beyond this section of the yard. For about ten minutes before the accident the switch engine had been standing on track No. 2, headed north, the rear end of the tender being about 215 feet from where track No. 2 joined one of the main tracks as a switch. Track No. 1 was occupied by the train of freight cars just delivered there by the Southern Railway. The rear end of this train on track No. 1 was nearly opposite the rear of the tender on track No. 2, and was about 323 feet from another switch where track No. 1 led into a lead track. The switch engine was to back to the switch on track No. 2, then to the switch on track No. 1, then go northwardly on track No. 1 to switch the freight cars in order to get together such of them as were destined for transportation by the Nashville, Chattanooga & St. Louis Railway to Atlanta, Georgia, and other points south. There were some twenty-five or thirty cars in this train, all of them being box cars, except three flat cars, which were on the rear of the train. Mr. Walker and his fellow employee Witham had been sitting in a shack west of the main track, and, when they heard the train come, they went over among the tracks, Mr. Walker intending to inspect

6

the cars, particularly the wheels, to see if any of them were flat. Immediately before the accident he was about 20 feet from the end of the tender of the switch engine, and standing between track No. 1 and track No. 2, close to track No. 2. The cars were being held for the inspection, and there was hurry about making up the train. The cars were moving slowly, and Mr. Walker was inspecting the wheels with the aid of a carbide light. The yard was well lighted by large electric lights, especially where the engine was standing and where he was injured. The clearance between box and flat cars and an engine standing on these two tracks was as follows: Between the cars and the back step of the tender, 4 feet 9½ inches; and 4 feet 2 inches from the bumper beam above the step, 3 feet 9 inches at a point toward the head of the engine where the frog is hung in the ring, 3 feet 8 inches from the step of the engine that goes into the cab, 3 feet 3 inches between the cylinder of the engine near the front and the box or flat cars. The Southern Railway, a connecting carrier, for many months previous to the accident, had been delivering a train of freight cars each night between 11 and 12 o'clock to the Nashville, Chattanooga & St. Louis Railway in this same switchyard; the train arriving usually about 11 o'clock. This was a usual and customary movement of the train and the switch engine. The switch engine would be moved into a side track, and, as soon as the Southern train arrived on the other side track and cleared the switch, the switch engine would move out on to the lead track and then head in toward the Southern train in order to break up that train and place the cars upon other tracks and in other trains. It was customary, when the Southern train cleared the switch over the track over which it moved, for the switchman to throw the switch and then cross over to the next track upon which the switch engine was located and give the switch engine the signal to back out and to head in upon the track upon which the Southern train was standing, for the purpose of breaking up and distributing the cars. These things were in course of being done when the accident occurred. This same switch engine in charge of the same engineer had been engaged in this work, together with the same crew of yardmen and switchmen, for a number of months prior to the accident. Mr. Walker had been in night service as a car inspector in these yards for about 11 months, and had been inspecting this same train every night.

The negligence charged was the violation of two alleged rules and customs of the defendant, in the operation of a switch engine, that the bell be rung or the whistle sounded, and that the headlight be turned on, so as to give notice to employees that the engine was about to move, before starting it. It is conceded that the bell was not rung nor the whistle blown. As to the headlight being turned on, there

is a conflict in the evidence. The light on the rear of the tender had been cut off so as not to blind the crew of the freight train.

Only one witness actually saw the accident. He was a man named Gifford, who was not an employee, but who had come into the yards to board a train going to Bridgeport, Ala. He testified that he saw a light flashing under the train and through the cars; that he stopped and watched the light; that he did not see Walker until the train passed on, and, as he was below him, he could see him over the flat car; that then the switch engine came along backwards while Walker was headed the other way, and it knocked him down; that Walker had appeared to be standing off the ends of the cross-ties, but close to them facing the moving train and "sort of stooped over" and looking under the train; that he was "crushed down" and was then lying face downward.

██ ██ This witness said that the engine lights were not turned on before the accident but were turned on about when the man was struck. The engineer, the fireman, the switchman, the foreman of the switch crew and a herder named Coggins all testified that the headlight was turned on before or about the time the engine was started. However, the testimony of Gifford is positive that the light was not turned on, and the jury must be deemed as having accepted it as true. This is binding upon this court. It was established beyond controversy that the recognized rule and custom of the railway was to turn on the headlight when an engine had been stopped and was again started. Thus we must conclude that there was a violation of this rule and custom, and the jury could infer that the deceased would not have been struck had this rule and custom been observed; for, had the light been turned on, he would have removed himself from danger or the engineer or fireman would have seen him in time to stop the slowly moving engine.

As to failure to observe any rule, custom, or duty to ring the bell or blow the whistle, the evidence is too insubstantial to constitute a basis for the verdict. It appears that in 1906 the employing carrier promulgated a printed rule that "the engine bell must be rung when the engine is about to move." It does not appear that this rule had application in the switchyards. It does appear without dispute that later the company issued a bulletin prohibiting the ringing of bells in the city yards, and that the practice had been discontinued because it created confusion, and there was substituted for it the turning on of lights as warning to employees. The ringing of the bell had been prohibited by an ordinance of the city of Chattanooga. It is true that one witness, J. L. Ligon, a son-in-law of the deceased, and who worked in the yards prior to 1931, said that he was "always under the impression that at night they were supposed to ring the bell and turn the light on." H. C. Hines testified that he

worked there 15 years ago, and that, if an engine was stopped waiting for another train, they were supposed to ring the bell before moving the engine. None of this testimony is sufficient in substance to show the existence of any rule or custom of ringing the bell at the time of the accident. There is no evidence that there was any duty to blow the whistle. It cannot be inferred from any of the evidence that the deceased might, or reasonably could, have relied on such warnings.

The book of rules of the railway issued in 1906 contained the following:

"Do not rely upon others to give notice of approach of engines or trains, or remain near tracks when trains are passing, as coal, stone, timber, car doors or other articles are liable to fall from train. On double tracks, stand outside and clear both tracks."

The deceased was not struck by the passing train, but by the engine on the other track. The same book contained a rule requiring that yard engines must display lights at front and rear by night; and that by night headlight be displayed on the rear of an engine being moved between trains and yards. Employees were in this book cautioned that obedience to rules is essential to safety of passengers and employees and to protection of property. Mr. Witham testified that he and Mr. Walker understood that everybody had to look out for his own safety. He said that he had warned Mr. Walker of the danger of going behind cars and engines, and that in their shack there was a bulletin signed by the master mechanic warning employees in the yard to desist from walking around cuts of cars too close to the end cars. This testimony is not disputed. However, the deceased was not struck while walking around a cut of cars. He was struck while leaning over or standing too close to the track containing the switch engine.

■ This action is not based upon the violation of any statute for the safety of employees. It is only such violation that eliminates the defenses of contributory negligence and assumption of the risk in an action brought under the Federal Employers' Liability Act. Seaboard Air Line Railway v. Horton, 233 U. S., 492, 34 S. Ct., 635, 58 L. Ed., 1062, L. R. A., 1915C, 1, Ann. Cas., 1915B, 475; Jacobs v. Southern· Ry. Co., 241 U. S., 229, 36 S. Ct., 588, 60 L. Ed., 970. In many cases arising under the said act these defenses have been sustained so that no recovery was allowed. Davis v. Kennedy, 266 U. S., 147, 45 S. Ct., 33, 69 L. Ed., 212 (engineer failing to look out for an oncoming train) ; Atlantic Coast Line R. R. Co. v. Davis, 279 U. S., 34, 35, 49 S. Ct., 210, 73 L. Ed., 601 (flagman taking place of obvious danger from swinging of boom of steam shovel) ; Jacobs v. Southern Ry. Co., 241 U. S., 229, 36 S. Ct., 588, 60 L. Ed., 970 (fireman injured by stumbling over a pile of hot cinders holding a can of drinking water when he knew of their existence and did not notice

them); Boldt v. Pennsylvania R. Co., 245 U. S., 441, 38 S. Ct., 139, 62 L. Ed., 385, 386 (yard conductor killed while between cars contrary to instructions); Chesapeake & O. R. Co. v. Nixon, 271 U. S., 218, 46 S. Ct., 495, 70 L. Ed., 914 (section hand, riding velocipede on track by permission in going to his work, held obligated to rely on his own watchfulness as to moving trains); Toledo, St. L. & W. R. Co. v. Allen, 276 U. S., 165, 48 S. Ct., 215, 72 L. Ed., 513 (car checker struck by a shunted car, he being familiar with the condition of the tracks and the method of doing the work). In these cases, and also in Unadilla Valley R. R. Co. v. Caldine, 278 U. S., 139, 49 S. Ct., 91, 73 L. Ed., 224, and Southern Ry. Co. v. Youngblood, 286 U. S., 313, 52 S. Ct., 518, 76 L. Ed., 1124, the negligence of the employees killed or injured was held to be the sole proximate cause.

The act imposes liability upon the carrier for injury or death resulting "in whole or in part" from the negligence of any of its officers, agents, or employees (U. S. C., title 45, sec. 51, 45 U. S. C. A., sec. 51), so that it is only where the employee's negligence was the primary cause of the accident that no recovery can be had. Whether he was guilty of such negligence is to be determined in the light of all the facts he knew or ought reasonably to have known. If there was evidence from which the jury might find that the other agents of the carrier were guilty of negligence which contributed to the accident, such finding would be conclusive upon this court. See Rocco v. Lehigh Valley R. Co., 288 U. S., 275, 53 S. Ct., 343, 77 L. Ed., 743.

The evidence that the lights were not turned on before the engine moved, and that this was required by the carrier's rule, was sufficient to require that the issue as to negligence and assumption of the risk be submitted to the jury; so that it was not error to refuse to direct a verdict for the defendant. The jury could conclude that the deceased was not primarily negligent because he knew the rule requiring the display of the lights before starting the engine, and had a right to rely on compliance with it; and it also could conclude that the act of the deceased in going near the end of the tender instead of in front of the engine was not the sole proximate cause of the accident. In other words, there was evidence from which the jury could reasonably find that the negligence of the defendant's agents and employees was a proximate cause.

The refusal of the trial judge to instruct the jury, upon request made by the defendant, that the operatives of the switch engine were not required to ring the bell when the engine was about to move, was not reversible error, as the verdict may be referred to the failure to turn on the lights as the basis of finding of negligence; there being evidence tending to sustain such finding. Tennessee Cent. Railway Co. v. Umenstetter, 155 Tenn., 235, 291 S. W., 452; Hager v. Hager, 17 Tenn. App., 143, 66 S. W. (2d), 250.

■ The jury awarded $8,000 to the administrator, but a remittitur of $3,000 was suggested by the trial judge, and judgment for $5,000 was rendered. No complaint of the remittitur is made in this court. There is no evidence that it was made because of any appeals to passion or prejudice, so that the rule that a new trial must be had where verdict is obtained by such appeal is not applicable. Minneapolis, St. P. & S. S. M. Railway Company v. Moquin, 283 U. S., 520, 51 S. Ct., 501, 75 L. Ed., 1243. Under three assignments of error it is insisted that this judgment is excessive; that the trial judge erred in instructing the jury, and in refusing a request to charge the jury, upon the measure of damages applicable to this case.

The decedent was 62 years of age, in good health, and earning $160 per month. He left no widow but four children, daughters, all of whom were married. He lived for 3 days after the accident, in suffering. His daughter, Mrs. Woodall, testified as to his injuries as follows:

"Q. How was he hurt, what were his injuries? A. Well, his whole shoulder was just torn away, just holding by a piece of flesh, they clipped that loose and his whole arm fell out, and there was a hole in there looked the size of your head, he was hurt in his stomach and he had a hole knocked in the back of his head, his leg was crushed and his heel crushed."

His son-in-law testified that he suffered; that his arm was torn off, his stomach hurt, leg hurt, heel bruised all over, and his head hurt.

Under the amendment of April 5, 1910, to the Federal Employers' Liability Act (36 Stat., 291, sec. 2; 44 U. S. Stat. at L., part 1, p. 1443, sec. 59, 45 U. S. C. A., sec. 59), the right of action survives to the personal representative "for the benefit of the surviving widow or husband and children of such employee, and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, but in such cases there shall be only one recovery for the same injury."

■ ■ The recovery in such action may therefore include both damages for the decedent's conscious pain and suffering during the period between fatal injuries and death and damages for the pecuniary loss sustained by the relative or next of kin dependent upon the decedent, for whose benefit the action is brought, although there shall be only one recovery for the same injury. One claim is for the wrong to the injured person, and is confined to his personal loss and suffering before he died, while the other is for the wrong to the beneficiaries, and is confined to their pecuniary loss through his death. St. Louis, I. M. & S. R. Co. v. Craft, 237 U. S., 648, 35 S. Ct., 704, 59 L. Ed., 1160. The right of action survives to the personal representative for the benefit of the same beneficiaries in whose behalf the right of ac-

tion is given by the original act. Kansas City Southern Ry. Co. v. Leslie, 238 U. S., 599, 35 S. Ct., 844, 59 L. Ed., 1478.

It is clear from the evidence that the decedent's suffering must have been extreme. The very nature of the injuries as hereinbefore recited would leave no doubt that this is true. The jury has evidently taken this into account. Inasmuch as the law prescribes no exact standard by which the compensation to be awarded for personal injuries shall be awarded, and full compensation is impossible, in the abstract, and different individuals will vary in their estimate of the sum which will be a just pecuniary compensation, the appellate court will not attempt to substitute its judgment for that of the jury, unless the award clearly appears to be excessive; this statement being made with reference solely to the question of excessiveness apart from passion, prejudice, or caprice. The element of damages for pain and suffering must be considered in connection with the other element, loss sustained by dependent daughters through the death of their father. The instructions upon this point complained of are as follows:

"Now, if recovery is had in this case, it must be only for the pecuniary loss suffered by the surviving dependents, these four daughters for whose use this suit is brought, who have been deprived of the reasonable expectation of pecuniary benefits by the wrongful death of the injured employee, and the damages under Section One of the Act are strictly limited to the financial loss thus sustained.

"The jury will take into consideration in fixing it, the age, earning capacity, probable length of life of the deceased. They must also take into consideration the certainty of death, the uncertainty of life, and the fact that the beneficiaries did not receive all the money paid to the deceased; but, may take into consideration the fact as to whether any money was paid to the beneficiaries, and whether they had a reasonable expectation in the future of receiving such payments, such benefits, if any such were received, like any fact, and from all of those facts what would be reasonable for the actual pecuniary loss suffered by the beneficiaries."

The first paragraph of these instructions is indeed subject to the criticism that it specified all four of the daughters as entitled to any recovery, in the absence of any evidence that one of the daughters, Mrs. Hines, had received any contribution whatever from her father. It is true that a surviving child not dependent upon the deceased and with no reasonable expectation of any pecuniary benefit from the continuation of the decedent's life can have no recovery on the ground of such loss. Gulf, C. & S. F. Railway Co. v. McGinnis, 228 U. S., 173, 33 S. Ct., 426, 57 L. Ed., 785. Of course, the source of the right to recover in such an action is the federal statute. Damages are generally limited to such as result to the beneficiaries because they have been deprived of a reasonable expectation of pecuniary benefits by

the death of the employee; that is, benefits reasonably to be anticipated. American Railroad Co. v. Didricksen, 227 U. S., 145, 33 S. Ct., 224, 57 L. Ed., 456.

Mrs. Woodall testified that her father gave her money "all along," but she did not specify any amounts given. Her husband had been, since they were married, employed by the Southern Railway Company. She said that her father was the sole support of her sisters Mrs. Stewart and Mrs. Ligon; that Mrs. Stewart's husband, a leather worker by trade, had not been able to work after the first 2 years from their marriage; and they had been married about 12 years. She said that she could not say exactly what her father gave to Mrs. Stewart, but he paid the rent, "bought groceries, clothes, everything." Mrs. Stewart was not able, because of illness, to testify. Mrs. Woodall said that Mrs. Stewart and Mrs. Ligon did not have to ask their father for money, for he knew that they needed it, and he gave it to them all the time, and even paid off some notes secured by mortgage on Mrs. Ligon's home.

Mrs. Ligon testified that her father's contributions to her were regular, as she did not have any other means of support; that her husband was disabled from working; that her father not only made payments on her home for her, but gave her food, clothing, and other things that she was compelled to have. The decedent left a farm in Alabama, several thousand dollars in cash, and some life insurance.

Thus there is evidence of partial dependency on the part of Mrs. Woodall and total dependency on the part of Mrs. Stewart and Mrs. Ligon.

The instruction requested and refused by the trial judge was as follows:

"If you should believe from the evidence that the beneficiaries of the deceased, who are alleged to have been dependent, or partially dependent upon him for support, were deprived of future benefits through the death of Mr. Walker, and if you believe that his death resulted proximately as the result of the negligence of the defendant, as to which you have been instructed, your verdict should be upon the basis of the present value of such future benefits, and in computing the damages in that aspect of the case, you should reduce the amount of such future benefits to present value by making allowance for the earning power of money paid in a lump sum."

It is true that the present cash value of the future benefits of which the beneficiaries were deprived by the death, making adequate allowance according to the circumstances, for the earning power of money, is the proper measure of recovery in an action against the interstate railway carrier under the Federal Employers' Liability Act; and the jury must determine the present value of the pecuniary loss calculated as bearing interest at the highest net rate that can be had on money

safely invested. Gulf, C. & S. F. Railway Co. v. Moser, 275 U. S., 133, 48 S. Ct., 49, 72 L. Ed., 200; Chesapeake & O. Railway Co. v. Kelly, 241 U. S., 485, 36 S. Ct., 630, 60 L. Ed., 1117, L. R. A., 1917F, 367. The instruction thus requested therefore embodied an applicable rule, and it should have been given. However, in view of the award as reduced by the remittitur to $5,000, we are not warranted in holding that the refusal to give these instructions and the instructions given that any recovery must be for the benefit of all four of the daughters should work a reversal of this judgment. We could not say that the sum awarded would include any excess over the compensation for the pain and suffering endured by the decedent, and the present cash value of future benefits reasonably to be anticipated by at least three of the daughters, even if one of them had no reasonable anticipation of any benefits. We think that the errors were cured by the remittitur. N., C. & St. L. Railway v. Overcast, 3 Tenn. Civ. App., 235; Baskin & Cole v. Whitson, 8 Tenn. App., 578, 590; Phillips-Buttorff Mfg. Co. v. McAlexander, 15 Tenn. App., 618, 645; Railroad Co. v. Martin, 113 Tenn., 266, 87 S. W., 418; L. & N. Railroad Co. v. Johnson, 7 Tenn. Civ. App., 458.

All of the assignments of error are overruled, and the judgment of the circuit court is affirmed. A judgment will be entered in this court in favor of H. C. Hines, administrator, against the Nashville, Chattanooga & St. Louis Railway for the sum of $5,000, with interest from the date of the judgment in the circuit court, and all costs of this cause; the costs of the appeal being also adjudged against the surety on the appeal bond.

Faw, P. J., and Crownover, J., concur.