189 So. 203

**LOUISVILLE & N. R. CO. v. GRIZZARD.**

**3 Div. 262.**

Supreme Court of Alabama.

March 16, 1939.

Modified on Rehearing May 25, 1939.

52

Steiner, Crum & Weil, of Montgomery, for appellant.

Walter J. Knabe and Hill, Hill, Whiting & Rives, all of Montgomery, for appellee.

GARDNER, Justice.

Philip S. Grizzard, on December 17, 1936, was an engineer in the employ of the Louisville and Nashville Railroad Company, and in charge, as such engineer, of train No. 3, running between Montgomery and Mobile, Alabama, when he was killed as a result of a head-on collision with train No. 2, standing on the main line track of such road at Castleberry, Alabama: this latter train being in charge of engineer Gorey who likewise met his death in the same accident, as did the fireman on Grizzard's train No. 3.

Admittedly at the time of the collision both Grizzard and the railroad company were engaged in interstate commerce. The administrator of Grizzard's estate instituted this suit under the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–59, and recovered a judgment in the sum of $22,500, from which the defendant railroad company prosecutes this appeal.

Engineer Grizzard, plaintiff's intestate (to whom, for convenience, we shall refer as "plaintiff"), was a railroad engineer with approximately twenty-five years' experience on the Montgomery and Mobile division of the defendant railroad, and entirely familiar with the several stations, block signals, sidings, trestles, bridges, and other landmarks.

On the morning of the accident his train was south-bound and running over three hours late. The evidence indicates he was entirely normal and in good spirits, and the run to Evergreen from Montgomery was uneventful. At Evergreen plaintiff was handed three orders. The first order No. 63 (complete train 4:08 A. M.) was to the effect that train No. 2 (north-bound, we interpolate) was to meet train No. 3 (plaintiff's train) at Sparta. As No. 3 was the superior train by direction, under that

order it would remain on the main line, and No. 2 go in the siding. The next order (No. 64) in point of time (4:17 A. M.) was that train No. 38 should meet train No. 3 at west siding, Castleberry, "No. 3 take siding." Under this order plaintiff was directed to take the west siding at Castleberry. The last order (No. 71), in point of time (4:50 A. M.), superseded the first or order No. 63, and directed that train No. 2 meet No. 3 "at Castleberry instead of Sparta, No. 3 taking siding. No. 2 gets this at Castleberry."

At Castleberry there are two sidings, known as the east and west siding, and approaching Castleberry, going south, the east siding is reached several hundred feet in advance of the beginning of the west siding.

While order No. 71 directed No. 3 to take the siding, it did not designate either one or the other of these two sidings. These three orders were handed, one set to the conductor Gantt, and one to plaintiff at Evergreen by the operator Brooks, the conductor receiving his in the office, and plaintiff while walking from his engine towards the office. Plaintiff unfolded the order, and asked Brooks to hold up his light and then read them. After reading order No. 64, he said: "That's 38 at the west siding Castleberry: we take the siding." He then read order No. 71, and said "That's No. 2 at Castleberry: we take the siding and they get it there." Brooks replied, "That's right," and plaintiff said, "All right, Brooksie, we will do it." Brooks, witness for defendant, further testified: "Mr. Grizzard and I had no other conversation about the sidings, as to which siding or what siding. That was not discussed. Mr. Grizzard looked at the orders and said, 'We take the siding at Castleberry.' One of the orders said west siding at Castleberry for 38, and he said, 'that puts us in the west siding for 38 at Castleberry.'"

The weather at Castleberry on this particular morning was intensely foggy, conductor Gantt stating, "You couldn't scarcely discern anything with absolute certainty further than ten feet."

When the collision occurred plaintiff had not reached the entrance to the west siding or passing track, the point of collision being some 124 feet therefrom. The two engines weighed approximately 230,000 pounds each, and the impact as a result of the collision was great, demolishing these engines and the two cars back of each, and also destroying the water tank from which

Gorey's engine of No. 2 train was taking water, though no passenger coach was derailed.

Plaintiff's case is rested upon the theory that the issuance of orders No. 64 and No. 71, by the train dispatcher Coburn, were misleading and confusing (order No. 63 having been superseded, and here properly ignored), constituting negligence which proximately caused the collision.

Defendant insists these orders were entirely clear and proper, in no manner misleading or confusing, and that in fact the accident was due solely to plaintiff's own negligence in driving his engine at a fast and reckless speed, and in disregard of warning signals, and in violation of all rules of safety, and that there is no way to account for or explain plaintiff's actions, except to say he was asleep or physically incapacitated.

The trial court considered the evidence sufficed for a submission of these issues for the jury's determination, and the refusal of the affirmative charge duly requested by defendant presents the most important question here for consideration.

■ There are involved no controverted legal principles. Confessedly, the trial court was to apply federal law to a federal statute, and the case is controlled by well settled principles established by the federal decisions. There is no presumption of negligence in such cases. The burden is on the plaintiff to show negligence. The scintilla doctrine is inapplicable to this case. Louisville & Nashville R. Co. v. Finlay, 237 Ala. 116, 185 So. 904.

■ The negligence complained of must be the cause of the injury, and the jury is not permitted to speculate. "The case must be withdrawn from its consideration unless there is evidence from which the inference may reasonably be drawn that the injury suffered was caused by the negligent act of the employer." Atchison, Topeka & Santa Fe R. Co. v. Toops, 281 U.S. 351, 50 S.Ct. 281, 282, 74 L.Ed. 896; Patton v. Texas & Pacific R. Co., 179 U.S. 658, 21 S.Ct. 275, 45 L.Ed. 361; Northwestern Pacific R. Co. v. Bobo, 290 U.S. 499, 54 S.Ct. 263, 78 L.Ed. 462; Southern R. Co. v. Miller, 226 Ala. 366, 147 So. 149; Alabama Power Co. v. Pierre, 236 Ala. 521, 183 So. 665.

■ And contributory negligence is no bar to a recovery unless it is the sole proximate cause of the death. "The rule is well

established that, under the Federal Employers' Liability Act, if the injury resulted 'in whole or in part' from defendant's negligence, the cause of action is established, and that contributory negligence on the part of the employé is not a bar to recovery, but 'to be considered in mitigation of damages only.' Plaintiff's negligence, contributing with defendant's negligence, in the production of the injury, does not defeat the cause of action, but only lessens the damages." Davis v. Sorrell, 213 Ala. 191, 104 So. 397, 399.

█ But plaintiff had control and management of his engine, and its proper control and management constituted his primary duty, and if his death was directly due to his failure to discharge this primary duty, recovery may not be had on the ground that possibly it might have been prevented if those in secondary relation to the movement had done more. This is the rule applied in the federal decisions (Davis v. Kennedy, 266 U.S. 147, 45 S.Ct. 33, 69 L.Ed. 212; Unadilla Valley R. Co. v. Caldine, 278 U.S. 139, 49 S.Ct. 91, 73 L.Ed. 224; Great Northern R. Co. v. Wiles, 240 U.S. 444, 36 S.Ct. 406, 60 L.Ed. 732; Southern R. Co. v. Youngblood, 286 U.S. 313, 52 S.Ct. 518, 76 L.Ed. 1124), and given application by this Court in Davis v. Sorrell, supra.

█ And it may be conceded, plaintiff in this case assumed all risks, ordinary and extraordinary, incident to his employment, including those due to the negligence of his employer and fellow employee that were open and obvious, or known or appreciated, and assumption of risk is a complete defense in bar under the Federal Employers' Liability Act. Seaboard Air Line Ry. Co. v. Horton, 233 U.S. 492, 34 S.Ct. 635, 58 L.Ed. 1062, L.R.A.1915C, 1, Ann.Cas.1915B, 475; Missouri Pacific R. Co. v. David, 284 U.S. 460, 52 S.Ct. 242, 76 L.Ed. 399; Delaware, Lackawanna & Western R. Co. v. Koske, 279 U.S. 7, 49 S.Ct. 202, 73 L.Ed. 578. And where a rule of the employer, known to the employee, is in force and its terms are clear and unambiguous, the interpretation or construction of the rule is for the court, not the jury. Bradley v. Deaton, 208 Ala. 582, 94 So. 767. But when the rules are ambiguous, competent witnesses may explain them in ordinary every day practice. Louisville & Nashville R. Co. v. Jacobson, 218 Ala. 384, 118 So. 565; 22 Corpus Juris 548; 39 Corpus Juris 1165; 64 Corpus Juris 363.

█ Coming to a consideration of the proof, we are persuaded plaintiff made out his case of negligence in the issuance by Coburn, the train dispatcher, of orders 64 and 71 as misleading and confusing. We think it clear enough that plaintiff, as engineer in charge of train No. 3, understood from these orders that he was to move to Castleberry, the next station, only 10 miles distant, and there take the west siding, and that the testimony of operator Brooks strongly so indicates, as he detailed the conversation between them at the time. All agree that under defendant's rules all orders are to be brief and clear, and so clear that the engineer may read and understand as he runs his engine. Order 71 told plaintiff he was to meet train No. 2 at Castleberry, and then take the siding.

Defendant's evidence is to the effect there is a well recognized and long continued custom and practice, under such direction, that the first siding as he enters the station is to be taken, the order itself designating no particular passing track.

Admittedly there is no rule of defendant company to that effect. It is merely the custom and such orders under that custom are so construed. The first or east siding was something over 1500 feet north of where Gorey's train No. 2 was standing, and it is therefore argued that had plaintiff obeyed this order, as thus construed and understood by trainmen, he would have gone in on the east siding, and no collision could have occurred.

If defendant is correct in this insistence, then it may be conceded no recovery should be had. But this is not the whole story. Plaintiff was handed at the same time order No. 64, which directed him to meet No. 38 at Castleberry, and there he was specifically ordered to take the west siding, a considerable distance from the east siding. This siding was blocked by train No. 2, and plaintiff never reached it.

Plaintiff's evidence is to the effect that with the two orders in his hand, one specifying the west siding, the other failing to designate any particlar siding, it was plaintiff's duty to go in the west siding. Train order 64 was never annulled, nor superseded. It was plaintiff's duty to obey orders, and not to question the reason of their issuance. Coburn testified to the reasons for these orders. In the event No.

38 was delayed and did not reach Castle-berry at the time he then anticipated, he intended to advance No. 3 to another station and thus facilitate traffic. But none of these reasons were communicated to plaintiff. So far as he knew No. 38 might be ahead of No. 2, and so far as he knew a freight train might have been occupying, at least in part, the east passing track.

Defendant's witnesses admit, several of them at least, that for plaintiff to comply with these two orders 64 and 71, literally, he would go first into the east siding for No. 2, and back out and go into the west siding for No. 38. But practically all agree this would have been a most unusual movement. Defendant's engineer Devinney finally admitted that he would "simply ignore the word 'west' and stay on the east siding." And yet all agree that engineers must obey orders, and not use their own discretion.

Furthermore, we conclude the jury would be authorized to infer from the evidence that a literal compliance with these orders, even accepting defendant's construction of them, required a most unusual movement, and that form order 31 should have been used in the place of form 19, which was employed.

In the issuance of orders the dispatcher should take into account weather conditions, and it appears dispatcher Coburn had been notified of the very heavy fog at Castleberry and community on this morning. Under such conditions the dispatcher is to exercise extreme caution in giving train orders. Where automatic block signals are in use a 19 train order may be issued to restrict the superiority of a train, as was the case here with train No. 3, the superiority of which was by these orders being restricted. There is, however, an exception, and that exception is "when there is a congestion of trains involving complicated and unusual movements."

Defendant insists that the presence of three or even more trains at a station where passing track facilities are available constitutes no congestion, and that this exception is inapplicable. But a literal compliance with the orders constituted a most unusual movement, and we think the jury might well infer the meeting of these trains under these circumstances constituted "a congestion of trains involving complicated and unusual movements." Under defendant's rules this called for

form 31, though its witnesses state it is rarely put into use. Holt, the chief train dispatcher, states that form 31 is necessary and is used in case of washouts, explaining: "a man passes a station, goes two miles, finds a washout and backs up, and that's repeated all over the road. In that case, for fear train crews may become mixed, the train dispatcher would then occasionally resort to a 31 order." It may be inferred from this testimony that the 31 order is for the purpose of saving confusion to the train crew in the event of congestion of trains; and we conclude the jury could infer from the evidence in this case that the literal compliance with orders 64 and 71 constituted a most unusual movement, one calculated to confuse the members of the train crews of the three different trains expected to meet at that point.

If in this we are correct, then the jury may very reasonably infer form order 31 would have proven most helpful and perhaps prevented the collision. This for the reason that it is a more "solemn" order than 19, and requires that the conductor and engineer read the orders together and understand them alike. Conductor Gantt, on plaintiff's train, testified that he understood these orders to call for the train to enter the east passing track at Castleberry. We think the evidence tends strongly to indicate that plaintiff engineer understood them otherwise, and that he would proceed to the west passing track.

Looking in the retrospect, if the conductor and engineer had been required to read the orders together, and understand them alike, these differences might then and there have been settled and the accident avoided. Train 38 was a faster train than No. 2, and plaintiff's evidence tends to show that plaintiff had reason to expect train 38 to reach Castleberry in advance of No. 2. Train 38 was aware that No. 3 was to be on the west siding. Engineer Gorey of train No. 2 received no copy of order 64 which called for plaintiff's train to take the west siding. Witness Grant, for plaintiff, states that proper railroad practice would have required that engineer Gorey be notified that No. 3 would take the west siding. But we forego further discussion of this question.

We find ourselves, from a careful study of this record, persuaded that the jury might very reasonably infer from the evidence that the issuance of orders 64 and 71

were confusing and misleading, and that in fact form 31 should have been used. Plaintiff, therefore, has made out a case for the jury's determination of negligence as charged in count 4 as a proximate cause of the accident.

But defendant argues that if negligence in respect to these orders be conceded, yet plaintiff should not recover for the reason that his death was the result of his own reckless and indifferent conduct; that his own negligence was the sole proximate cause of his death, and, of consequence, the negligence complained of could not have been the proximate cause. And it is further argued that any verdict to the contrary must be rested upon mere speculation, and cannot be allowed to stand.

Among the cited cases are New York Central R. Co. v. Ambrose, 280 U.S. 486, 50 S.Ct. 198, 74 L.Ed. 562; Atchison, Topeka & Santa Fe R. Co. v. Toops, 281 U.S. 351, 50 S.Ct. 281, 74 L.Ed. 896; Patton v. Texas & Pacific R. Co., 179 U.S. 658, 21 S.Ct. 275, 45 L.Ed. 361; Lang v. New York Central R. Co., 255 U.S. 455, 41 S.Ct. 381, 65 L.Ed. 729; Northwestern Pacific R. Co. v. Bobo, 290 U.S. 499, 54 S.Ct. 263, 78 L.Ed. 462; Mobile & Ohio R. Co. v. Williams, 224 Ala. 125, 139 So. 337, each of which has been examined, together with other authorities hereinabove noted touching upon questions of like character, including Davis v. Kennedy, 266 U.S. 147, 45 S.Ct. 33, 69 L.Ed. 212, and Davis v. Sorrell, 213 Ala. 191, 104 So. 397. We have likewise read and considered Hudson v. Norfolk & Western R. Co., 106 W.Va. 437, 146 S.E. 525, pressed upon our attention by defendant. They are useful as authorities containing the guiding legal principles involved, and serve as apt illustrations.

■■ But of course each cause must be determined upon its own peculiar facts. In considering questions of this character, it must be borne in mind that contributory negligence on plaintiff's part does not bar recovery under the Federal Employers' Liability Act, but only serves in mitigation of damages. Plaintiff's negligence, contributing with defendant's negligence in the production of the injury, does not defeat the cause of action, but only lessens the damages. To defeat the action plaintiff's negligence must have been the sole cause. It is only when plaintiff's act is the sole cause—when defendant's act is no part of the causation—that defendant is free from liability under this Act. Grand Trunk

Western R. Co. v. Lindsay, 233 U.S. 42, 34 S.Ct. 581, 58 L.Ed. 838, Ann.Cas.1914C, 168; Louisville & Nashville R. Co. v. Jacobson, 218 Ala. 384, 118 So. 565. If defendant's negligent act was a "part of the causation," and in fact the foundation thereof, then plaintiff's negligence contributing thereto is to be considered only in diminution of the damages. Louisville & Nashville R. Co. v. Jacobson, supra.

In view of the conclusion reached that the jury might reasonably infer form order 31 should have been given, which would have resulted in a mutual understanding between the conductor and engineer of train No. 3 when handed these orders at Evergreen, only 10 miles from the point of collision, it may be doubted that it could be held in any event as a matter of law that plaintiff's alleged negligent conduct was the sole proximate cause.

■ But that question aside and undetermined; and conceding for the moment the applicability of the legal principle insisted upon by defendant, yet we are persuaded the question as to plaintiff's negligence, as charged by defendant, was properly submitted to the jury, or if negligent, whether or not his negligence was the sole cause of the collision.

Defendant argues that plaintiff did not blow his whistle at the caution signal, or the station whistle for Castleberry or for the crossing, or the signal board at the depot: that he was required to bring his train under control and be prepared to stop at the home signal: that he passed the caution signal running 60 miles per hour and the home signal at from 30 to 50 miles per hour; that there were electric lights at Castleberry, lights at the station, and the headlights of train No. 2, that all of these matters told him he was at Castleberry, which was a regular stopping place for his train, and that notwithstanding all of this, he struck train No. 2 running at 30 to 50 miles per hour, and at such speed he could not possibly have stopped his train at the entrance of the west siding by the use either of service or emergency brakes. We may add here that as to whether or not headlights on train No. 2 were burning, the record is silent, and there is some evidence tending to show that headlights are of no great value in so dense a fog.

Confessedly a strong indictment against plaintiff for negligence in the operation of his train is thus made out. But there are

other facts and circumstances to be considered.

Defendant has argued, as before indicated, that plaintiff's conduct is only to be explained upon the theory he was asleep or physically incapacitated.

We are persuaded, however, the jury might well infer he was neither, but was awake and in possession of his faculties. In coming from Evergreen to Castleberry plaintiff was required to slow down to 10 miles an hour at a trestle some 100 feet in length, which was half way between Evergreen and Castleberry. Plaintiff had a slow down order for this trestle, and Gantt testified, "It was religiously obeyed." And this was at a point only 5 miles from Castleberry. According to the time table thirteen minutes were allotted for the distance between Evergreen and Castleberry; but on this particular occasion the running time was seventeen minutes. Gantt accounts for the difference in the slow down at the trestle, but we think the jury could reasonably infer that it was due in part at least to a lessened speed between the stations, and that in fact Gantt was mistaken when he stated plaintiff was running 60 miles per hour just prior to slowing down with service brakes just before he got to Castleberry, which speed he states was reduced 15 miles per hour by application of service brakes, which stayed on "until the trouble came." Plaintiff did give signals with his whistle, perhaps better illustrated by the following excerpt from Gantt's testimony: "After we left Evergreen, the signal whistle I heard on the approach toward Castleberry was two distinct signals at or near the distant signal north of Castleberry. The distant signal north of Castleberry is the approach signal, and is approximately a mile and a half north of Castleberry. I heard two distinct blasts of the whistle at that time. They are usually given by the engineer. I gave him a signal about reducing speed. The kind of signal I gave him to reduce speed was four blasts of the bell cord, which is a communicating signal. I gave him four blasts on that to reduce the speed. My only assurance or belief that the signal reached him, which would indicate as much, was the observance of smoke settling down along the train. That indicated he had closed his engine off, and the engine was drifting. It indicated the signal had reached him, and that he had reduced speed. We do not have any speedometer on the train. He was asked 'Your judgment about speed is just your guess about it, is it not?' and he answered 'Well, yes, sir.' Shortly after he was given the signal, that is the communicating signal, I felt the brakes applied shortly afterwards." Gantt said that shortly after the distant signal was passed, going into Castleberry, he heard an indistinct whistle signal. It was "intensely foggy," and you could not discern anything with absolute certainty further than 10 feet. Coburn stated the operator at Castleberry reported he could not see the block for the fog. Train and train crews, under such conditions, are almost entirely dependent upon orders and block signals. Gantt was inside the train, and his estimate as to speed should be considered in connection with the testimony of engineer Devinney who says the only way to judge speed accurately is to hold the watch on the mile posts. But when his vision was so obscured by the fog, we construe his testimony to mean that speed is judged largely by instinct and experience; and other evidence tends to show that the estimates under such conditions are largely guess work.

The brakes were applied north of the home signal, and the train was gradually reducing its speed, though Gantt says the emergency brakes were never applied. When Gantt saw he had passed the home signal, he states he made an effort to get to the air brakes, but it was too late, and that the "whole operation * * * happened in about a minute and a quarter." James, the operator at Castleberry, testified that as he turned to go into the telegraph office he heard No. 3 blow at whistle board for the station. This was about a mile from the station, so he states, though engineer Miniard estimates the distance at only three-quarters of a mile. He then went in his office, went around the counter to a table and reported No. 3 coming. The dispatcher answered and gave him "O.K.". All of this time consumed after the whistle a mile or three-quarters of a mile away should also be considered in connection with the matter of speed. And plaintiff's average speed between Evergreen and Castleberry was only at the rate of about 37 miles per hour.

The impact was great, with resulting damage of large proportions. But how great would be the damage with a speed of fifteen miles per hour, or considerably less than the minimum estimate of the conductor of 30 miles per hour, is uncertain,

and no witness ventured an opinion. And as to the speed, the jury was not bound by the estimate of the minimum of 30 miles per hour made by the conductor, nor the higher estimate by those standing on the ground. In considering this matter, the jury are to take into account the density of the fog, the reduced speed with the engine closed, and "drifting," as Gantt says was indicated, the average of time consumed from Evergreen to Castleberry, the blowing of the whistle, as testified to by the conductor and by James, the operator, and all that the latter did, together with the time that necessarily must have elapsed from the moment he heard the whistle until the moment of contact. All also in connection with the proof tending to show plaintiff's familiarity with the various locations and signals, and his understanding that he was to go in the west siding.

Defendant offers much proof that plaintiff could not have stopped his train at that speed so as to enter the west siding. But we conclude that all of this was for the jury under the facts and circumstances here presented, further details of which must necessarily be here omitted.

And even though the jury might find that plaintiff failed to have his engine under as perfect control as he should, and that he could not have stopped so as to take the west siding, but must pass it some distance before coming to a full stop, yet the jury could also infer that plaintiff had no reason to anticipate the west siding would be blocked by train No. 2, or that it would be so near as to endanger his train if it went a short distance beyond. In view of all the facts and circumstances, the jury could find plaintiff guilty of some degree of negligence, which merely contributed with defendant's negligence in producing the collision, but was not the sole cause. Such a finding by the jury would present no bar to recovery, as we have previously indicated.

Nor could plaintiff be denied recovery for the passing of the "home" signal standing at red or "stop". There was evidence to the effect that signal would stand in that position whether train No. 2 was within or afoul the west siding, and that the rules of defendant permitted plaintiff, who was ordered to take the siding, to pass this signal and proceed at restricted speed, and whether he continued at restricted speed within the meaning of the rule was, as we have indicated, a jury question.

We so conclude, with recognition of the distinction between the federal rule upon the matter of the affirmative charge and the scintilla rule prevailing in this State, and so recognizing this distinction, we think a case for the affirmative charge in defendant's behalf was not made out.

■ Defendant further insists it was due the affirmative charge upon the theory that recoverable damages are solely compensatory to dependent relatives, and that in awarding a lump sum to take the place of monthly contributions that the deceased is alleged to have made to his dependents, the jury is required to calculate interest and earning power of money at the highest net rate at which money can be safely invested in the community. Mobile & Ohio R. Co. v. Williams, 219 Ala. 238, 121 So. 722; Gulf C. & S. F. R. Co. v. Moser, 275 U.S. 133, 48 S.Ct. 49, 72 L.Ed. 200; Chesapeake & O. R. Co. v. Gainey, 241 U.S. 494, 36 S.Ct. 633, 60 L.Ed. 1124; Chesapeake & O. R. Co. v. Kelly, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117, L.R.A.1917F, 367.

That the trial court correctly instructed the jury in accord with these authorities we do not understand is here questioned. But defendant argues the affirmative charge was its due for a lack of evidence tending to show the highest rate or any other rate of interest or return at which money could be safely invested.

The Georgia Court of Appeals in Western & Atlantic R. R. v. Lochridge, 39 Ga. App. 246, 146 S.E. 776, held that intelligent jurors may be presumed to be able to make proper allowance therefor in estimating the present value of a sum of money payable in the future, though no evidence upon that subject was introduced. And the Kentucky Court holds to like effect. Chesapeake & O. N. R. Co. v. Adams, 207 Ky. 668, 269 S.W. 1009. The following authorities likewise add force to the holding of the Georgia and Kentucky courts upon this question: Head v. Hargrave, 105 U.S. 45, 26 L.Ed. 1028; Coral Gables v. Patterson, 231 Ala. 649, 166 So. 40; 23 Corpus Juris 63; 89 A.L.R. 1351; Indemnity Ins. Co. v. Holiway, 233 Ala. 100, 170 So. 329; Louisville & Nashville R. Co. v. Williams, 183 Ala. 138, 62 So. 679, Ann.Cas.1915D, 483; Birmingham Belt R. Co. v. Hendrix, 215 Ala. 285, 110 So. 312.

There was no error in the refusal of the affirmative charge based upon this theory of the case.

Our previous discussion in regard to the giving of orders 64 and 71 we think suffices as an answer to assignments of error 4, 9 and 10, 5, 12, 6, 7, 8 and 13, and the discussion upon the question of plaintiff's negligence as the sole proximate cause of his death also suffices as an answer to assignment No. 11.

And in view of our consideration of the refusal of the affirmative charge upon the theory of a lack of evidence as to earning power of money, assignments of error 14 and 15 have been sufficiently answered.

As to assignment No. 16, we think the record clearly shows the trial court limited as to the minor children any compensation for deprivation of financial support and maintenance to the period of their minority, and that the jury so understood.

Defendant brought out in full from the witness Gantt, on cross-examination, anything that was excluded on plaintiff's motion, and this assignment (19) so clearly presents no error to reverse that we consider further discussion unnecessary.

Assignments 17, 18, 20, 21, 22, 23, 24 and 25, related to leading questions permitted to plaintiff by the court, evidently upon the theory the witness was hostile to plaintiff's cause, and were matters resting in the sound discretion of the trial court. Section 7732, Code 1923; Dismukes v. Trivers Clothing Co., 221 Ala. 29, 127 So. 188.

We conclude the rules of defendant offered in evidence and pertinent to this case were ambiguous and their proper construction was for the jury under all the evidence. Louisville & Nashville R. Co. v. Jacobson, 218 Ala. 384, 118 So. 565; 22 Corpus Juris 548.

The case is readily distinguished from Bradley v. Deaton, 208 Ala. 582, 94 So. 767.

Assignments of error 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 38, 40, 41, 42, 43, and 44 are without merit.

Grant and Posey sufficiently qualified as experienced railroad men, and defendant can take nothing by assignments 39 and 47.

We need not stop to inquire as to the sufficiency of count 1 on demurrer. It is clear enough count 1 and count 4 each presented the same issue, and evidence offered under either count was admissible under the other. The verdict is properly referable to either count.

Conceding for the moment the insufficiency of count 1 (a question undetermined—Birmingham Belt R. Co. v. Hendrix, 215 Ala. 285, 110 So. 312), the action of the court in overruling the demurrer thereto would be error without injury.

This whole case was tried upon the negligence set forth in count 4, and the holding of this Court in Alabama Power Co. v. Lewis, 224 Ala. 594, 141 So. 229, is equally applicable here. As to count 4, we think it sufficient, and not subject to the assignments of demurrer interposed thereto. Birmingham Belt R. Co. v. Hendrix, supra.

Assignments of error 51 and 52 go to the denial of defendant's motion for a new trial. The insistence here. is that the verdict is excessive, and ground for reversal of the judgment under the federal statute (Minneapolis St. P. & S. S. R. Co. v. Moquin, 283 U.S. 520, 51 S.Ct. 501, 75 L.Ed. 1243) as distinguished from our statutory rule for a reduction of the judgment and a remittitur.

Engineer Grizzard was fifty-seven years of age when he died, and had a life expectancy of sixteen years. On the hearing of the motion, defendant offered a table prepared by a life insurance actuary showing also a substandard classification for railroad employees which would give Grizzard a life expectancy of only twelve years. But the only table offered in evidence and before the jury on the trial was the American standard containing no such substandard classification, and the jury were justified in the consideration of that table only, though not necessarily to be treated as an absolute guide. Chesapeake & O. R. Co. v. Kelly, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117, L.R.A.1917F, 367. The jury had a right to calculate the present value of the loss of future support upon such rate of interest as an average man, with reasonable diligence could earn on a reasonably safe investment over a long period of years. The table offered on the hearing of the motion is based upon a calculation at six and eight per centum. But, as said in Chesapeake & O. R. Co. v. Kelly, 241 U.S. 485, 36 S.Ct. 630, 632, 60 L.Ed. 1117, L.R.A.1917F, 367, "It may be that such rates are not obtainable upon investments on safe securities, at least, without the exercise of financial experience and skill in the administration of the fund; and it is evident that the compensation

should be awarded upon a basis that does not call upon the beneficiaries to exercise such skill, for where this is necessarily employed the interest return is in part earned by the investor rather than by the investment." And the opinion in that case further observes that it is a "matter of common knowledge that, as a rule, the best and safest investments, and those which require the least care, yield only a moderate return."

Not only so, but defendant's table makes no allowance for any pecuniary value of the care, attention, instruction, training, advice and guidance, which the evidence tended to show that Grizzard might be reasonably expected to continue to give his three daughters, triplets, seventeeen years of age, during their minority. Mobile & Ohio R. Co. v. Williams, 226 Ala. 541, 147 So. 819.

He left a widow fifty-four years of age, and these three minor children, all dependent upon him for support. His average salary per month in 1935 was $296.52, and for the eleven months of 1936, preceding his death, $292.51. There was evidence from which the jury could find that he expended on his family in excess of $200 per month, one of the girls who rendered the greater service in household affairs at one time placed the estimate as high as $230 or $240 per month. All of these matters duly considered, we are unable to find justification for a new trial upon the ground of excessivenes of the verdict.

We have treated the various assignments of error argued by counsel, and have given them due consideration in the light of the forceful and helpful arguments of counsel for the respective parties to this cause. In consideration of the evidence some details necessarily must be omitted in the discussion, but they have not been overlooked in our study of the case. We fail to find in any of the assignments just cause for a reversal of the judgment rendered. It follows, therefore, that the judgment will be here affirmed.

Affirmed.

BOULDIN, FOSTER, and KNIGHT, JJ., concur.

### On Rehearing.

GARDNER, Justice.

Upon consideration of this cause in consultation we were impressed that by the verdict the jury had awarded plaintiff substantially full compensation with little, if any, consideration to any matter of negligence on intestate's part contributing to the fatal result.

We were impressed, upon consideration of much of the evidence tending to show that Grizzard, the engineer, ran his engine into the territory of Castleberry with too much speed, that this matter should have been given consideration by way of reduction of the damages awarded.

But counsel for defendant, in brief, had interpreted the case of Minneapolis, St. P. & S. S. M. R. Co. v. Moquin, 283 U.S. 520, 51 S.Ct. 501, 75 L.Ed. 1243, as denying the right of the court to reduce the amount of the verdict and affirm the case conditionally as thus reduced; and counsel for plaintiff acquiesced in that interpretation of the Moquin case. Counsel for each of the parties thus agreeing upon that legal question, we were lead to accept it without further inquiry as correct, and, of consequence, gave no further consideration to the matter of reduction.

However, defendant's counsel, on this application, in their supplemental brief, admit they had mistakenly construed the Moquin case, supra, and point out that decision was rested upon the theory that the entire verdict was the result of misconduct on the trial in an appeal to passion and prejudice, and thus an impartial trial was prevented. Further examination of the federal authorities is persuasive that the federal courts have held with uniformity that where excessiveness of the verdict was involved, on motion for a new trial, the court had the power to invoke the doctrine of reduction by remittitur of damages, which, if not accepted, would result in a reversal.

Many of the authorities are found cited in Dimick v. Schiedt, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603, 95 A.L.R. 1150, and in the annotated notes thereto, and need not be here repeated. Not only is this well established by the federal authorities, but this Court in Louisville & N. R. Co. v. Parker, 223 Ala. 626, 138 So. 231, assumed as much, and followed that practice wherein the Federal Employers' Liability Act was, as here, involved.

We, therefore, feel it our duty to give consideration to this question, and have reexamined the case in the light of this conclusion.

As previously indicated, whatever may have been the initial fault as to misleading orders, we are impressed from all the evidence, including the disastrous consequence to the engines that were wholly demolished, Grizzard himself was not free from blame in that his speed in entering Castleberry was too great and lacking in caution. We, therefore, conclude that his contributory negligence being considered, the verdict was excessive and should be reduced.

A judgment will accordingly be here entered that, unless appellee files a remittitur, as provided by law, with the Clerk of this Court within thirty days, reducing the judgment to $16,000, the judgment of the trial court will stand reversed. If such remittitur is duly filed, the judgment for $16,000, with interest from October 29, 1937, the date of the judgment, will stand affirmed. The ten per cent. penalty is not to be assessed, and under such an order the appellee is taxed with the costs of this appeal. The costs as taxed against defendant in the court below will of course stand. Western Union Tel. Co. v. Bashinsky, Case & Co., 217 Ala. 661, 117 So. 289; Montgomery Light & Water Power Co. v. Thombs, 204 Ala. 678, 87 So. 205; Louisville & Nashville R. Co. v. Parker, 223 Ala. 626, 138 So. 231.

The original opinion and judgment are modified as herein indicated, and the judgment affirmed conditionally.

Affirmed conditionally.

BOULDIN, FOSTER, and KNIGHT, JJ., concur.