**BOWSER v. BALTIMORE & O. R. CO.**

**No. 8711.**

Circuit Court of Appeals, Third Circuit.

Argued Jan. 16, 1945.

Decided Oct. 24, 1945.

As Amended Dec. 7, 1945.

McALLISTER, Circuit Judge, dissenting.

Samuel W. Pringle, of Pittsburgh, Pa. (Jesse P. Long, of Punxsutawney, Pa., Dalzell, McFall, Pringle & Bredin, of Pittsburgh, Pa., on the brief), for appellant.

Vincent M. Casey, of Pittsburgh, Pa. (Margiotti, Pugliese & Casey, of Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, GOODRICH, and McALLISTER, Circuit Judges.

BIGGS, Circuit Judge.

Harry Bowser's widow and administratrix brought suit against the defendant under the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–60, alleging that her husband was killed, as is conceded, when two engines collided on one of the defendant's tracks in its yard at New Castle Junction, Pennsylvania. The complaint alleges, inter alia that the defendant's negligence lay in the failure of Bowser's fellow-servants to stop the train before it passed a red signal referred to hereinafter.[1]

The facts are as follows. Bowser had been employed by the defendant from July, 1902, until his death on January 17, 1940. He had had more than thirty-seven years of service as a fireman and a locomotive engineer. For some years prior to the accident he had diabetes mellitus. His disease was not sufficiently advanced to require insulin treatments but he maintained a carefully restricted diet with prescribed medication. There was evidence from which the jury could have concluded that he was in a diabetic coma at the time of the accident. This testimony will be discussed at a later point in this opinion.

At the time of the collision Bowser was the engineer of a light freight engine which was engaged in pulling a train of forty freight cars, eastbound out of the yard. A westbound freight train, en route from Connellsville, was entering the yard at the time of the accident. The westbound train was pulled by a heavy type freight engine, operated by one Frizzell, also an experienced engineer. It consisted of one hundred seventeen freight cars. There was a tower operator, one Dover, at a tower designated as the "UN tower", near the west end of the yard. It was Dover's duty to move trains into and out of the yard. Bowser's train came out of the yard on a switch at a cross-over and was to move easterly along the eastbound main track toward a signal known as the "No. 2 Home" signal.

When Bowser's engine reached a point opposite the UN tower a red signal showed on the tower signal bridge which required Bowser to stop his train short of it and wait for a clearing signal before proceeding. It was about 8:20 P.M. and the winter night was clear. Bowser brought his train to a stop. He blew his whistle for a clearing signal, received it from Dover and moved his train at a speed of from 8 to 10 miles an hour down the track toward the No. 2 Home signal which was about 1100 feet distant to the east.

A few feet short of 428 feet east of the "Home" signal the eastbound main track, on which Bowser's train was proceeding, runs into a switch (which we designate as "No. 1 switch") directed west and connecting the eastbound main track with the westbound main track. Further to the east the eastbound main track runs into another switch (which we designate as "No. 2 switch") and meets a third track known as the "P. & L. E. connection." The freight train operated by Frizzell, proceeding at a slow speed, was on the track last designated. Frizzell's train was to leave the P. & L. E. connection track by the No. 2 switch, proceed for a very short distance along the eastbound main track and then cross by the No. 1 switch to the westbound main track and thence move into the yard. A short distance east of the No. 2 switch was a signal bridge, the signals of which controlled the westbound movements of trains on the P. & L. E. connection, on the eastbound main track and on the westbound main track. These signals were operated by Dover at the UN tower as were switches No. 1 and No. 2. It was Dover's intention to stop Bowser's train at, or just before, the No. 2 Home signal which controlled the eastbound movements on the eastbound main track. To effect this result Dover had set the No. 2 Home signal at red. At or about the same time he set the signals on the signal bridge east of the No. 2 switch and also set switches No. 1 and No. 2 so that Frizzell's train might make the movement hereinbefore described into the yard.

As Frizzell's train moved on the P. & L. E. connection toward the eastbound main track he and his engine crew first saw the headlight on Bowser's engine and heard Bowser's train approaching. Frizzell thought that Bowser's engine was then about 40 to 45 car-lengths away. Frizzell dimmed his headlight two or three times

---

[1] Neither the appellant nor the appellee has printed any portion of the pleading.

but there was no answering dimming signal from Bowser's engine. Frizzell assumed, as he had the right to do in view of the go-ahead signal on the signal bridge, that Bowser's train would stop at the Home signal. Frizzell thereupon proceeded west. Bowser's engine, however, did not stop before, at or immediately after the No. 2 Home signal but continued eastward without diminishing its slow but steady speed. Frizzell suddenly realized that Bowser was not going to stop. The two engines were then not more than 5 car-lengths apart. Frizzell threw his engine's brakes in emergency and stopped his train within 10 feet. Bowser's train moved on and his engine ran into Frizzell's engine at a point just east of switch No. 1, at a point 428 feet east of No. 2 Home signal. Apparently the front drivers of Frizzell's engine were already a few feet over on the switch tracks when he stopped it. Bowser's lighter engine rode up upon Frizzell's heavier one, cracking the boiler of the lighter locomotive. Live steam escaped. As soon as possible rescuers entered the cabin of Bowser's engine. Bowser, his fireman Kunkle, and his "front" brakeman Welty, were found to be dead.

Bowser's body was discovered in a sitting position on his seat box on the right side of the engine, his head slumped down on his chest. His right arm was hanging out the window. Fireman Kunkle's body was found on the deck of the engine facing west (toward the tender), crushed by the wooden end-sill which had served as a buffer between the tank and the engine. The tank had moved up over the tender apron and, lying across Kunkle's lap, had pinned him to the deck of the engine. There was no evidence that Kunkle was engaged in firing the engine at the time of the collision. Brakeman Welty's body was found on the forward seat on the left side of the cab, next to the boiler. The seat had been pushed up against the boiler head. Kunkle's seat was just behind that of the brakeman.

Just before the accident and when Bowser's engine was about two car-lengths west of the Home signal, Dover realized that something was wrong and that Bowser was not going to stop at a point at or before the Home signal. He immediately sounded the signal-tower siren and when Bowser's engine did not stop he rushed out onto the steps of the tower and swung a red lantern in the "swing-down" position in an effort to stop the train. Bowser's flagman, White, who was riding in the caboose, saw Dover swing the lantern down and was actually reaching for the angle-cock on the rear of the caboose to break the air and apply the brakes in emergency when the collision occurred.

There was evidence to the effect that Bowser's train could have been stopped by the use of brakes in emergency within a very short distance. The testimony suggests 20 or 30 feet. We will employ the figure of 20 feet in determining the questions presented by this appeal. There was no proof of defective equipment of any of the units comprising Bowser's train and there is no suggestion that the equipment along the right-of-way, for example, the Home signal, did not function properly.

■ There is no evidence that Frizzell or any member of his crew, or that Dover or flagman White of Bowser's train were negligent. If there was negligence in the occurrence of this very unusual accident it lies in Bowser's own failure to act, or in the failure of Kunkle or Welty to act in time to avoid the accident. If Bowser was guilty only of contributory negligence, such negligence would be pertinent only to the issue of mitigation of damages pursuant to the provisions of 45 U.S.C.A. § 53. Cf. Davis v. Kennedy, 266 U.S. 147, 45 S.Ct. 33, 69 L.Ed. 212, and Frese v. Chicago, B. & Q. R. Co., 263 U.S. 1, 44 S.Ct. 1, 68 L.Ed. 131. It is conceded by the defendant that it was the duty of Kunkle and Welty to have observed all signals, such as the Home signal, and to have called them as soon as seen to Bowser, precisely as it was Bowser's duty to have called signals to Kunkle and Welty. It was the duty of that member of the engine crew who first saw the Home signal to have called it immediately and it was the duty of the other members of the crew in the engine immediately to answer the call. The defendant concedes also that if the engineer of a train is incapacitated or disabled it is the duty of the fireman immediately to stop the train and that if a locomotive passes a stop signal, the fireman at once must take the necessary steps to halt the train. The foregoing concessions are based on the operating rules of the defendant.

■■ At the close of the plaintiff's case the defendant moved for a dismissal of the action, inter alia, upon the ground that the plaintiff had not proved that the defendant or any of its agents had been negligent.

The court below granted the motion and gave judgment for the defendant.[2] The inferences to be drawn from the evidence therefore must be those most favorable to the plaintiff. In our opinion the plaintiff is entitled to the inference that Kunkle either knew or should have known that the Home signal was red or that Bowser was in a state of inattention and did not see the signal. Our reasons are as follows. There was substantial evidence from which the jury could have found that Kunkle and Welty could have seen the Home signal when their engine proceeded on the angle formed by the cross-over from the westbound main track to the eastbound main track in front of the UN tower. The signal was at red when Bowser's train moved past the UN tower.[3] Bowser of course could have seen the signal. It follows that Bowser first saw that the Home signal was at red and called it, that Kunkle or Welty saw it first and called it, or that no one saw the signal and that no one called it. If Bowser did not call it or answer Kunkle or Welty's call, Kunkle or Welty should have known that Bowser was in a state of inattention and immediately should have ascertained the reason for Bowser's inattention. If no one called the signal Kunkle or Welty were negligent. The inference is inescapable that of Kunkle and Welty, Kunkle at least should have known the status of the Home signal. Kunkle was an experienced railroad man accustomed to this particular run who knew as well as Bowser did that the Home signal governed the movement of his train. Moreover, the headlight of Frizzell's engine was clearly visible when Bowser's engine proceeded on the cross-over in front of the UN tower. Indeed at about this time Frizzell was dimming the headlight of his engine as a signal to Bowser. The situation was a critical one. Kunkle reasonably may be charged with knowledge of all pertinent circumstances.

A great deal of the evidence in the court below was devoted to proof that Bowser had diabetes and that he had fallen into a diabetic coma during the short interval which elapsed while his engine covered the 1076 feet between the point where he drove his engine past the UN tower and the point where it passed the Home signal. This interval lasted about 91 seconds. It was no less than 80 seconds if we assume, as we should, that Bowser would have stopped his engine at least 100 feet short of the signal so he could observe it color. Bowser was certainly conscious and able to act when he blew to get his clearing signal from Dover in the UN tower. He was surely not in the possession of his faculties at the moment when his engine reached the spot at which he should have stopped it before the Home signal.

■ An autopsy was performed upon Bowser's body. Dr. Bruecken, the expert pathologist who performed the autopsy, stated that in his opinion Bowser was in a diabetic coma at the time of the occurrence of the accident from which in all probability he would have recovered if he had received prompt medical treatment. It was impossible for the pathologist to test the dead man's blood for sugar content for his body had been embalmed. From an examination of the pancreas, which contained large lesions, Dr. Bruecken gave as the cause of Bowser's death, "Diabetic coma with Accidental Scalding."[4] The physician also based his diagnosis on the fact that the dead man's stomach was "consid-

---

[2] See 55 F.Supp. 48.

[3] See Dover's testimony, pp. 117, 118 of transcript. He testified that it was his duty as to Bowser's train to have "the track lined up" "to a point beyond No. 2 Home Signal"; that he, Dover, did so; and that it was Bowser's duty to remain at the signal until Dover got "the route lined up beyond No. 2 signal".

Dover was asked, "As Extra 2750 [Bowser's train] proceeded past your tower toward home signal 2, what signal was being displayed by home signal 2?" He replied: "Red—stop position." See p. 118.

[4] Dr. Bruecken stated: "Well, if I may be permitted, when we classify our cases of death for autopsy, for teaching and scientific and just purposes, we try to do our best to classify cases. For me to know that this man had coma, of course is assumption entirely on the basis of my findings in his pancreas, that he had the lesions found in diabetes —mellitus, to be specific. And then in addition, of course, I had hearsay from all round me that he was being treated for diabetes. That added to it. Now, we must take these things into consideration scientifically for scientific classification of diabetes. I could bolster up my diagnosis of diabetes mellitus, but I could not be sure except by inference that the man had coma. I think he did but I don't know that."

He then expressed his professional judgment that Bowser was in a diabetic coma.

erably distended" and "filled with a large amount of soft material only partly digested * * *." Some of this material consisted of carbohydrates, notoriously deleterious to the health of persons suffering from diabetes mellitus. It should also be pointed out that a specimen of Bowser's urine, left at his home the morning preceding the day of the accident, and examined and tested by his daughter, a registered nurse, in accordance with her customary technique, showed an absence of sugar. Bowser may have been negligent in breaking his dietary regimen but proof was not offered on this issue. In the light of all of the plaintiff's testimony tending to show that Bowser was in a diabetic coma or at least in a state of inattention caused by his disease, we think that the jury would have been entitled to infer that he was incapable of stopping his engine at the critical moment. The evidence on which the defendant relies looks the other way but the issue presented was preeminently one for the jury.

■■ If the jury had resolved this question in the plaintiff's favor, another issue would have required determination. This may be stated as follows: Was Kunkle or Welty or either of them negligent in not stopping the engine of their train when it moved past the point where Bowser should have stopped it? The Home signal was 428 feet distant from the point where the collision occurred. The jury would have been justified in finding that Bowser's engine was moving at the rate of 8 miles an hour and that Kunkle, at least, should have been aware that the Home signal was red and Bowser had passed it. The jury could have found that Bowser's train could have been stopped within 20 feet. Without reference to the customary practice among train operators to stop a train some distance before a signal in order to observe it Bowser's engine had 428 feet less 20 feet (the distance required for stopping it) to go from the Home signal before it reached the point of the collision. Call this 400 feet and translate it into time (assuming a speed of 8 miles an hour for Bowser's train), and the

inference follows that Kunkle had about 34 seconds to move from his position in the second seat on the left of the engine cabin and across its deck and into Bowser's side of the cabin, throwing the engine's throttle into neutral and applying its brakes in emergency. The last two operations should not have taken more than 10 seconds. Kunkle therefore had at least 24 seconds to move from his place on the left side of the cabin and into Bowser's side and to a position from which he would have been able to do the acts necessary to bring the train to a stop. The distance which he would have had to cover was not more than 20 feet.

It may be urged of course that neither Kunkle nor Welty was aware of the arrival of their engine at the Home signal and that therefore neither would have had reason to know that they and Bowser were in a position of imminent danger. This contention may be supported as to Welty who, as we have stated, was a new man on the run. But Kunkle, as we have stated repeatedly, was an experienced fireman who had worked with Bowser on numerous occasions and who was thoroughly familiar with the New Castle Yard and its tracks and signals.[5] For this reason we think that Kunkle should have known when Bowser's engine passed the Home signal. At the very least it would be permissible to permit the jury to draw such an inference under the circumstances.

■ Whether or not Kunkle or Welty were negligent either because they failed to observe the danger or failed to act was a question for the jury. The decision in Jenkins v. Kurn, 313 U.S. 256, 61 S.Ct. 934, 85 L.Ed. 1316, supplies an analogy. See also Missouri Pac. R. Co. v. Jones, 124 Tex. 234, 76 S.W.2d 1044, certiorari denied 294 U.S. 729, 55 S.Ct. 638, 79 L.Ed. 1259; Louisville & N. R. Co. v. Grizzard, 238 Ala. 49, 189 So. 203, certiorari denied 308 U.S. 603, 60 S.Ct. 140, 84 L.Ed. 504; and Fisher v. Chicago, R. I. & P. R. Co., 290 Ill. 49, 124 N.E. 831. At the new trial interrogatories submitted to the jury might be employed to

[5] As to evidence which would support the inference that Kunkle was an experienced fireman who had worked with Bowser on numerous occasions and knew the New Castle yard and its tracks and signals, see the following: (1) The stipulation as to Kunkle's employment and experience; (2) Frizzell's testimony that the crew of Bowser's engine was the "regular crew," comparing Fox's testimony that "West" Welty was not the "regular brakeman" of Bowser's crew; (3) Frizzell's testimony that Bowser's train was making a "usual movement," a "common movement" out of the yard; and (4) Mrs. Bowser's testimony that her husband had been on the "New Castle trip five times * * *."

clarify the issues of negligence and of Bowser's possible contributory negligence.

The judgment is reversed and a new trial ordered.

McALLISTER, Circuit Judge (dissenting).

The only question in this case is whether there was sufficient evidence to justify the submission of the question of the negligence of the fireman and brakeman to the jury. The trial court determined that appellant's evidence was insufficient. In the accompanying opinion, it is held that there was proof from which the jury could properly have found, from a preponderance of the evidence, that the fireman and brakeman were negligent, either in their failure to call, or repeat, the signals to Bowser, and (whether or not they were so negligent) in their failure to stop the engine, after it had proceeded through a red light stop signal.

The strength of appellant's case lies in this: That there was a duty on the part of the brakeman and fireman to observe all signals within their vision, and to call them out to Bowser; that there was an obligation on their part to use due care to avoid a collision; that they could have stopped the engine after it had proceeded past the red light signal, and so avoided the collision; and that, nevertheless, the engine did proceed past the red light signal, where it should have stopped, and continued on for 428 feet, where it collided at a cross-over track with the engine coming from the east.

The questions for determination are whether, in the exercise of due care, they could have called the signals to Bowser; and whether, in the exercise of due care, they knew, or should have known, that the train had proceeded through a stop signal, and should have brought the engine to a stop before the collision. On the question of Bowser's alleged insensibility or incapacity to operate the engine at the time of the collision, there was no evidence, in my opinion, from which reasonable inferences could be drawn that he was in a state of coma at the time of the accident.

In considering the question whether there was evidence of negligence on the part of the fireman and brakeman, it is to be remembered that they, with Bowser, were killed in the collision, and are, accordingly, entitled to the presumption that they were free from negligence, and acting in the exercise of due care at the time of the accident. As to their observation of signals,

their calling them to Bowser, and their claimed negligence in not stopping the train before the collision, we may first consider the fact that the engineer rides on the right side of the engine cab, and the fireman and brakeman on the left side. Often, the engineer can see a signal from his side of the engine, which the fireman and brakeman cannot see from their side. This usually happens on curves. In this case, appellant's counsel sought to introduce evidence to the effect that the fireman and brakeman could have seen Home signal No. 2 (the red light signal in question) as easily as could the engineer, Bowser. Counsel in examining the witness Frizzell, the engineer of the other train, asked:

"Q. Now, in making the movement which Extra 2750 (Bowser's train) made out of the yard and over to the eastbound track, does the engineman have a view of Home signal No. 2? A. He does * * *

"Q. Can the fireman see that signal? A. Well, no, not as well as the engineer can see it. He can get a glimpse of it, too, when the engine is on the cross-over, and then when it starts to make the right hand curve his view is obscured. He can't see around the front end. He could, possibly, if he leaned away out of the window and looked around.

"Q. He can see it when he is at the UN Tower can't he? A. Before he gets over the cross-over.

"Q. He can see it before the cross-over at UN Tower is completed? A. Before the movement is completed, yes. * * *

"Q. From the time you complete cross-over 13 and get on to the eastbound main track, coming east out of the yard, do both the engineman and the fireman have a clear view of Home signal 2? A. I haven't rode the left side of the engine, I couldn't tell you just exactly, but the fireman's view is obscured after we get on the eastbound main and the engine starts to cross to the right, then his view is more or less obscured and he may not be able to see it without leaning away out of the window."

From the UN Tower to Home signal No. 2 the distance is 1076 feet. The end of the cross-over on the main track is 207 feet east of the tower. Therefore, the fireman or brakeman, according to the above testimony (which is the only testimony in the case on the point) could only have caught a glimpse of Home signal No. 2, when they were approximately 900 to 1100 feet from

the signal. This glimpse would have been down a long curve, while they were passing over to another track; and they might not have been able to see the signal again as they approached it, unless they leaned far out of the window. But the engineer could have seen it practically continuously for this entire distance.

If it was the duty of the fireman and the brakeman to call the signal to Bowser, or to repeat aloud his call of the signal to them, when the engine was crossing over to another track at the UN Tower, we must assume that they so called or repeated the signal, as their due care and discharge of duty is here presumed by law, and there is no evidence or proper inference to be drawn from the evidence, to the contrary. This being the case, the brakeman and the fireman, in the exercise of due care, may well have been completely ignorant of the fact that the engine passed the stop light a thousand feet beyond the tower, for, as far as is disclosed by the evidence, the brakeman and fireman, from their side of the cab, may not have been able to see—and probably were not able to see—the stop signal when the engine proceeded past it. They would therefore not know whether it had been passed before the collision, for the signal was on the engineer's side of the track, and the evidence above mentioned shows that their view of it was probably obstructed.

Bowser was the man who could see the signal plainly. If he was inattentive and did not see the signal, or did not call it out to the fireman and brakeman, there was no evidence that they would have had any way of knowing that the engine had passed through a red stop light, or that they would have had any knowledge that would have required them to take control of the train from Bowser and stop the engine. Under such circumstances there would be no evidence from which inferences could be reasonably drawn, to overcome the presumption of due care, that they had negligently failed to interfere with Bowser's control of the engine, and stop the train.

At the time of collision, the brakeman was sitting on his seat at the left of the cab. Bowser was in his seat on the right of the cab. The fireman apparently was standing in between them, behind the end of the locomotive boiler. If the presumption of due care be indulged, all three men would be entitled to such presumption, unless it was overcome by proof to the con-

trary. In the case of Bowser—if the proposition were in issue—it would be a serious question whether the presumption had been overcome by proof that he proceeded through a red light that was plainly visible to him. If his attention was elsewhere at the crucial time, and if he neglected to see the signal, it would not be the first time that an engineer in full possession of his faculties has negligently proceeded through a stop signal with disastrous results.

Furthermore, it may be observed that none of the foregoing discussion takes into consideration the written rules and regulations governing the operation of trains, issued by the company and binding on engineers, firemen, brakemen, and other employees of the railroad, and which provide that a fireman or brakeman may take over the control of a train from the engineer only when the latter is insensible or incapable of operating the engine. Under these rules, neither the fireman nor brakeman could be found guilty of negligence in this case, especially in view of the presumption of care which must be entertained and applied in any consideration of their conduct at the time of the accident.

There was no proof that the signal was visible to the fireman and brakeman—in fact, the proof in this regard is to the contrary. I find no evidence from which a reasonable inference could be drawn that the collision was caused by the negligence of the brakeman and fireman, either by their action, or by their failure to act.

In the prevailing opinion, in this case, it is held that the jury had the right to infer that the deceased engineer, Bowser, was incapable of stopping his engine at the critical moment, in the light of testimony tending to show that he was in a diabetic coma, or in a state of inattention caused by diabetes. This, of course, would bear upon the claimed negligence of the fireman and brakeman, in not taking over control of the train, after they had seen, or should have seen, Bowser insensible or incapable of operating the engine. I am unable to agree that there is any proof or evidence, from which reasonable inferences could be drawn that Bowser was in a state of diabetic coma at the time of the accident. True, it is conceded that he had sugar diabetes. But, from the time the disease was first diagnosed and for three years thereafter until the time of his death, he had been treated by a physician, who examined him every two weeks during that period up to Septem-

ber 1939. A diet had been prescribed, which was carefully followed by Bowser; and his physician—of large experience in such cases—testified that he never had a patient that responded better to the treatment for diabetes. In fact, the doctor stated that so well did Bowser follow instructions, and his prescribed diet, that he did not think anyone would have known that he was ill in any way during this time. Bowser's step-daughter was a registered nurse, who arranged for the kind of meals required by the diet, and who made regular urine tests, which showed that, through following the diet, Bowser had been able to control the amount of sugar in his blood. One of these tests, made by the nurse on the night of Bowser's death, of urine that he had voided the morning before, showed no sugar in the urine. Bowser did not require the use of insulin, and did not take it.

The conclusion that Bowser had suffered a coma just before the collision is based upon the testimony of the pathologist, who performed the post mortem, and who testified that in his opinion Bowser had suffered a diabetic coma. His opinion was based upon the fact that Bowser had diabetes, and that (1) he might have taken an excessive amount of insulin to overcome a large meal that he was in the habit of taking, or (2) that he had a heavy meal of certain articles of diet that would lead to an increase of sugar in his blood, which would tend to bring on coma. This is the crucial testimony in the case on whether Bowser suffered a coma before the accident. It seems to me that no reasonable inference could be drawn from such expert testimony, that Bowser suffered a coma at the time of the accident.

In the first place, Bowser never took insulin—at least his step-daughter, the registered nurse who regularly supervised his diet, medication, and urine tests, said that he had never taken it. From all the evidence he had no need of it. His physician said he had never prescribed it, and that Bowser never used it. There is no testimony connecting Bowser with the use of insulin, except the pathologist's guess that coma might have been brought on by Bowser's having taken an excessive amount of insulin—if he took insulin. With respect to the other inference, drawn by the pathologist that coma had resulted from Bowser's indulging in a heavy meal which he was in the habit of taking, and which included articles of diet that would lead to an increase of sugar in the blood—which tends to bring on coma in diabetes—I am unable to find any evidence in the case from which such an inference could reasonably be drawn.

A brief review of the testimony, on which counsel for appellant base their claim that the deceased suffered a coma at the time of the accident, discloses that the pathologist was first asked whether in his professional judgment Bowser was in a diabetic coma. This question was objected to on the ground that it was incompetent, irrelevant and immaterial. The trial court overruled the objection, stating, however, that counsel might ask to have the testimony stricken after cross-examination. The witness then answered that in his opinion Bowser was in a coma.

"Q. Will you state what in the autopsy findings from an examination of his body supported that opinion? A. The lesions in the pancreas. I can go into detail, if that is what you like. I don't know if that will be profitable, but it showed that diabetes mellitus shows characteristically in the pancreas, if that is what you mean. * * *"

The witness was then asked the hypothetical question:

"Q. Dr. Bruecken, assuming that acting under medical advice, he sought a medical examination in October of 1936, that he was then examined by a physician, Dr. William C. Newcome, who found sugar diabetes mellitus, made that diagnosis, and thereafter for a period of three years treated him for that condition, by placing him on a strict diet and giving him, in capsule form, pancreatic extract, and also a liver medicine with iron in it, to which treatment he responded apparently satisfactorily, so as to reduce the presence of sugar from tests taken at regular intervals of his urine—taking that history into consideration in connection with your autopsy examination and findings, will you state whether or not that history in connection with the autopsy findings supports your conclusion that this man was in a diabetic coma prior to his actual death? A. I wish you would have said "diabetes". That would be easier. But I think it does support my autopsy findings, *particularly with the presence of a heavy meal in the stomach—*

"Mr. Casey: *That is not in the question.*

"The Court: Give your response first, and if counsel should later want you to explain, why, he can ask you that. * * *

"Q. Will you state what you found as to a heavy meal in the stomach? * * * A (Witness reads from report as follows: 'The stomach was considerably distended and filled with a large amount of soft material, only partly digested. Small pieces of vegetable could be made out.') It is pretty hard to make out everything, of course, but there was still a large amount of soft material, only partly digested. Small pieces of vegetable could be made out."

The witness was then asked:

"Q. What effect would a heavy meal, *such as you found there,* have on a person suffering from sugar diabetes mellitus?"

Here, it seems to me is the crucial part of the testimony. For it will be observed that the foregoing question was never answered, although the witness glossed it over, and his response is relied upon by appellant as evidence from which an inference of coma can be drawn. What the witness actually answered was:

"A. Well, that is common knowledge. Transgressing the doctor's prescription—prohibition, you might say—of certain articles of diet, would lead to an increase of sugar in the blood, and increase the condition proportionately, depending on how much of a counter-indicated food he ate, like starches, sugars, etc.

"Q. Would you state whether or not *that* would tend to bring on diabetic coma? A. Most assuredly, *that* is what does it. It is the only thing that does it." (Italics supplied)

There is here no reply to the question addressed to the witness of what would have been the effect on a person suffering from sugar diabetes, of a heavy meal, "such as you found there". The answer was only that transgression of the doctor's prohibition in eating food that would lead to an increase of sugar in the blood—depending on how much of a counter-indicated food he ate—would tend to bring on coma. But there was no proof that deceased had transgressed the doctor's prohibition, or that he had eaten counter-indicated foods that would cause an increase of sugar in the blood. Moreover, it was not inadvertent on the part of the witness to answer in the fashion he did. He did not know that, as he had rather glibly put it, the deceased was *"in the habit* of taking" a heavy meal.

He did not know whether the deceased had eaten of such counter-indicated foods or not. He had no knowledge on the subject. But the cross-examination is illuminating, as showing that his entire conclusion as to a coma was only a guess, unsupported by evidence or reasonable inferences to be drawn from the evidence in the case. He testified on cross-examination that he could tell from the diseased pancreas that the deceased had diabetes; but that he could not determine from morphological findings that Bowser had suffered coma. The witness said that he had assumed that deceased had been in a diabetic coma, "because of the meal and the history, the partially digested meal from which he had absorbed a good deal, which gave him the rise in his sugar and that would lead to coma. Now that is the way I assume it. I did not prove it with a blood sugar test, because I couldn't. He was embalmed."

He was then asked if he would not have to know before arriving at any conclusion as to coma what the type of food was that the deceased had consumed and when he so consumed it. "Oh, that would be naturally of some weight," he replied. "If it consisted of a great deal of carbohydrates—well, he had those. I did identify vegetable matter that was not yet digested, so he had carbohydrates undoubtedly."

Then came the important question:

"Q. So far as you know, though, he might have been adhering to his diet, and that meal might have been strictly on the diet given to him, is that correct? A. That is true; *I could not tell from the digested state how much carbohydrate was present."*

The obvious conclusion that the supposition of coma was based merely upon speculation, followed, as indicated in the remainder of the cross-examination of the witness.

"Q. So what you are saying doctor, is that Harry Bowser might have had a diabetic coma, is that correct? A. I said that from the very beginning. It is assumption.

"Q. And he might not have had? A. That is true, too.

"Q. Isn't it true, Dr. Bruecken, that there are a great number of people with a diseased pancreas such as you found, who do not go into coma? A. That is true. That is correct. Along that line I might simply add the tendency to sleepiness even after an ordinary meal in a healthy person. One could invoke that somnolence. I made

that very clear in my notanda, that I am not at all sure of diabetic coma.

"Q. You also in your notanda said 'or inattention'? A. That is right.

"Q. So all of these are assumptions on your part? A. They are all assumptions. I didn't say there was inattention, I didn't say there was coma, *but I had to make a diagnosis under the circumstances*, and I think that is the best diagnosis."

As far as is disclosed by the record then, coma could be reasonably inferred from: (1) An excessive use of insulin; or (2) a violation of the diet prescribed by his physician. There was no evidence of any use of insulin in the case. Violation of the prescribed diet could be proved or inferred in either of two ways—what kind of food was found in the stomach of the deceased, and whether there was sugar in his blood. There was no proof of either. The food was not analyzed. No test of blood was made. There was no other evidence in the case from which coma could be inferred.

There were some remarks about a "large meal" or a "heavy meal." But all testimony by the pathologist as to coma was based, not on the size of the meal, but on transgressing the doctor's prohibition of certain articles of diet. It was never testified that merely a large meal would bring on coma, and we are not informed from the record how large a meal was considered a "heavy meal", by the pathologist. As far as proofs go, we only know that there was no evidence that the deceased had violated his physician's instructions as to the size of the meal consumed or the kind of food prescribed for him—which he had eaten for the preceding three years with as successful a response and control over diabetes as any patient his physician had ever known.

From the foregoing it would appear that there was no evidence from which inferences could be reasonably drawn that the deceased suffered diabetic coma at the time of the accident. It is more reasonable, as I see it, to say, from the evidence, that he probably did not suffer coma, than to conclude that he did. Certainly there is no basis in what has been testified to from which reasonable inferences could be drawn that deceased suffered a coma at the time of the accident.

If there was no evidence from which to conclude that deceased was in a coma, there was no evidence that he was incapable of stopping his engine at the critical moment and nothing upon which to base conclusions that the fireman and brakeman, in the cab with the deceased, were negligent in not stopping the engine themselves. For there was nothing to put them on notice that Bowser was incapable, or, as heretofore stated, they had no notice of anything that would require them to stop the train, in the exercise of due care.

In accordance with the foregoing, I am of the opinion that appellant did not overcome the presumption of due care on the part of the fireman and brakeman and did not sustain the burden of proof; that there was no evidence from which reasonable inferences could be drawn that the fireman and brakeman were guilty of negligence; that the trial court properly directed a verdict in favor of appellee; and that the judgment of the district court should be affirmed.