**BOWSER v. BALTIMORE & O. R. CO.**

**No. 2145.**

District Court, W. D. Pennsylvania.
April 26, 1944.

Dalzell, McFall, Pringle & Bredin, of Pittsburgh, Pa., for plaintiff.

Margiotti, Pugliese & Casey, of Pittsburgh, Pa., for defendant.

GIBSON, District Judge.

When the complainant's testimony as to negligence was finished the court, upon motion of the defendant, directed a verdict in favor of the defendant. In due time the plaintiff moved for a new trial.

Complainant's decedent, Harry W. Bowser, as alleged by complainant, was killed in a collision of trains at New Castle Junction on the evening of January 17, 1940.

On the evening of the accident Harry W. Bowser was engineman on a train of forty cars, nineteen loaded and twenty-one empty. A few minutes before the collision, being about to take his train out in a westerly direction, he whistled for the signal from the UN Tower and was allowed to advance to Signal No. 2, 1,076 feet beyond the tower, where a red signal ordered him to stop. The stop signal was given to allow a train coming from the west to enter the New Castle yard. The signals permitting the train to enter the yard had all been set. This train consisted of 122 cars, most of them empty. The engineer was J. W. Frizzell, the fireman J. D. Fox and the front brakeman W. W. Reed.

The pleadings do not accurately describe the cause of the collision. The complainant alleges that Harry W. Bowser was engineer on engine No. 2750 of a train being operated on the eastward main track of the defendant company near UN Tower, when its locomotive collided with engine No. 6200 of a west-bound train which was then proceeding on the eastward main track and making a cross-over at cross-over 18. In fact, part of Mr. Bowser's train was still on the eastern track, but the stop signal at No. 22 had not been obeyed, and the engine No. 2750 had almost completed the crossing of cross-over No. 18, and collided with engine No. 6200 just as that engine had started to enter, or was about to enter, that cross-over. The point of collision was 428 feet beyond Signal No. 2.

With Harry W. Bowser on engine No. 2750, at the time of the collision, were Clarence Kunkle, fireman, and Frank Welty, brakeman. Both were instantly killed in the collision.

By the theory of counsel for the complainant, Harry W. Bowser was in a diabetic coma when his engine passed through the Signal No. 2, and entered the cross-over on which engine No. 6200 had been given the right of way. To establish his theory he called Dr. A. J. Bruecken, who performed an autopsy upon Mr. Bowser's body three days after the accident and after the body had been embalmed. He did state, in response to a direct question by counsel for plaintiff, that Bowser was in a diabetic coma at the time of the collision, but an examination of his testimony will show that he actually made no finding other than the existence of diabetes. Once, when asked as to his finding of coma, he said: "I wish you had said 'diabetes'". He several times repeated that his assumption of coma was but an assumption. Once he said: "I could bolster up my diagnosis of diabetes mellitus, but I could not be sure except by inference that the man had coma. I think he did, but I don't know." A review of Dr. Bruecken's testimony will show that Mr. Bowser, at the time of the collision, might have been already dead; or that he might have been in a coma; or that he might have been in a somnolent condition, short of coma, induced by diabetes, or he might have been somnolent due to a large meal shortly before the accident.

The evidence as to coma was very much weakened by other testimony that was offered. It appeared that a physician had examined Mr. Bowser in 1936, had found that he had diabetes and placed him upon a strict diet which proved to be successful so long as the physician had knowledge of the patient. He had not seen the patient for several years prior to the accident. The wife and daughter of Mr. Bowser each testified that the rigid diet had been continued, and constant tests were made to determine the existence of sugar. The wife testified that when her husband left her on the day before the accident he had tested his urine, and the daughter testified that she, after the collision, found some of the urine voided on the day before the accident, as testified by the mother, and found no sugar therein when she tested it. Under this testimony the existence of diabetic

50

coma on the following day would seem almost impossible.

■ The testimony as to coma being an essential part of the claim, we have undertaken to review it to some extent. However, although it received some consideration, it was not the basis of the order of the court. The plaintiff, in order to recover, was required to establish negligence on the part of the defendant or some of its agents, even if absolved from contributory negligence by coma. She has entirely failed to do so.

■ The first attempt of counsel for complainant to establish negligence is based upon a charge of failure to function on the part of the fireman and brakeman who were killed in the accident. By rule of the Railroad Company it was provided: "If the engineman becomes disabled, the fireman will stop the engine and report to the conductor, and not permit any unauthorized person to be upon it." P. 123, Transcript. Also several of the railroad witnesses stated that it was the duty of the fireman, and brakeman also, to stop the train upon discovering any disability of the engineman. The existence of the rule is a far cry from establishing negligence on the part of the fireman and brakeman. Each of them was killed in the accident and so is entitled to a presumption that he used due care. Each was suddenly put in dire peril without any fault of his own, and even granting the longest possible interval from which the trainmen might have noticed any incapacity of the engineman (assuming incapacity), they had but few seconds in which to act, and could not be held liable for possible mistake. However, all this is purely theoretical. There is no testimony which tends to establish any notice to the dead men of the incapacity of the engineman. Dr. Bruecken, asked on cross-examination: "And there would be no way, Doctor, for you to tell the exact time, from the study of a body, when a person went into a diabetic coma, would there?" stated, "No; especially not in such a short period as this must have been. That would have been utterly impossible." The only testimony throwing any light tending to show any lack of care on the part of the engineman was that of L. H. Dover, telegraph operator at UN Tower, who stated that he realized that engine No. 2750 was not going to stop at Signal 2, only when it was about two car lengths from the signal seconds away from the cross-over switch.

What had happened on the engine is known to nobody. It does appear that the fireman was not in his seat, but whether he had left it to examine or warn the engineman is left only to surmise.

In view of the testimony of Dr. Bruecken which leaves it uncertain what the condition of the engineman was, and which makes it quite possible that he was never totally unconscious prior to the collision, and in view of the presumption of due care on their part, it seems absolutely beyond reason to impute negligence to the fireman and brakeman.

Equally chimerical is the claim of negligence on the part of the train crew of engine No. 6200. It will be remembered that the train pulled by that engine had been given the signal, which authorized it to proceed to enter the New Castle yard over cross-over No. 18.

■ The first criticism of the engineman on No. 6200, J. W. Frizzell, is founded upon the latter's testimony that he, when he thought engine No. 2750 was back of signal No. 2, had dimmed his lights several times and the engineer on that engine had not responded by dimming his lights. Just what effect this failure to notice his signal should have had upon an engineman having a signal which authorized him to proceed is somewhat hard to say. Mr. Frizzell, in his testimony (Transcript, p. 32) stated in substance that dimming of lights was a matter of courtesy between engineers, sometimes observed and sometimes not. Fox, the fireman, made it "more or less a ruling or an act of courtesy" to dim in passing, and did say there was a rule. Counsel, however, in reading the rules applicable to the accident, failed to read any such rule. In any event the matter is of no moment as establishing negligence.

The next contention of counsel for plaintiff is that Frizzell was negligent in failing to sound his whistle as engine No. 2750 approached his train. This contention is bound together with the contention that Frizzell and his crew were negligent in failing, in some way, to notice that the other engine was approaching them. Frizzell testified that he saw the headlight of No. 2750 when he was 40 or 45 car lengths (about 1,700 or 1,800 feet) away. The engine was then undoubtedly upon its own track. As a matter of fact it never did get on Frizzell's track until it was 150 feet away. The switch, as we recollect the testimony, was that long, and engine No.

6200 was just short of the switch when Frizzell discovered that No. 2750 was moving. By his testimony the engine was four or five car lengths away (160-200 feet) when he realized that it was moving, at which time it must still have been on his own track or just about entering the cross-over. During this time he was moving forward upon a signal which allowed him to proceed. That it would have been possible for him or his crew to have earlier discovered that engine No. 2750 was past its signal and about to enter the cross-over is supported by no testimony whatsoever.

Counsel for complainant has alleged that the court erred in sustaining objections to an inquiry as to the time a fireman must act when the engineer was incapable or where a red signal stop was involved. This was to a question that theretofore had been answered. See Transcript, p. 44-5-6.

The other objection was based upon a failure to produce the best evidence—the rules. How the accident could have been prevented by blowing a whistle is difficult to see under all the testimony.

Finding no evidence of negligence on the part of the defendant, the motion for a new trial will be denied.